648 So.2d 366 (1995)
STATE of Louisiana
v.
John BROOKS.
No. 92-KA-3331.
Supreme Court of Louisiana.
January 17, 1995.
*367 Numa V. Bertel, Jr., Dwight M. Doskey, Clyde D. Merritt, for applicant.
Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Jack Peebles, Asst. Dist. Atty., for respondent.
CALOGERO, Chief Justice.[*]
John Brooks was tried on two counts of first degree murder, violations of LSA-R.S. 14:30, and was found guilty on each count. Following the penalty phase of Brooks' capital trial, the jury returned a unanimous verdict of death on each count. Brooks then took an appeal to this Court, invoking our appellate jurisdiction under Article V, § 5(D) of the Louisiana Constitution of 1974. Based upon our review of the record, we affirm the defendant's conviction. However, we reverse the sentence of death because of the admission of prior unadjudicated offenses during the penalty phase contrary to the standards announced by this Court in State v. Brooks, 541 So.2d 801 (La.1989).

I. Facts and Procedural Background
A gunman, apparently acting alone, engaged in a crime spree in New Orleans between August 23, 1986, and December 28, 1986. Over this span eight murders were committed, along with a large number of armed robberies, several rapes, and other assorted offenses. This case involves the prosecution of the defendant, John Brooks, for two of those murders.
The first of the two murders which are the subject of this opinion occurred on November 9, 1986, at about 4:30 am. Edward Harrison, the victim, had parked his Ford pick-up truck in the 1500 block of Annette Street in *368 New Orleans. Harrison was accompanied by his girlfriend, Debra Hilton.
As Harrison and Hilton were sitting in Harrison's truck, a stranger, later identified by Hilton as the defendant, John Brooks, appeared at the driver's window. Brooks pulled out a revolver and ordered Harrison and Hilton to turn over all of their money and jewelry. When Harrison told Brooks that he had no money, Brooks called Harrison a liar and repeated his demands. When Harrison continued to deny that he had any money, Brooks replied "You think I'm bullshitting, you think I'm bullshitting?" Brooks then shot Harrison in the upper left cheek, causing a through-and-through gunshot wound to the left side of Harrison's face. This wound resulted in a contusion to the upper part of Harrison's spinal cord causing cardiac arrest, asphyxiation, and almost immediate death.
After being shot, Harrison fell into Hilton's lap on the passenger side of the pick-up. While Hilton screamed, Brooks reached through the window and rifled Harrison's pockets. Brooks then ordered Hilton out of the truck. At that moment, however, a passing pedestrian caused Brooks to leave the scene.
The second murder resulting in the convictions which we now review occurred just a week later, on November 15, 1986, at approximately 1:15 am. At that time Archie Chapman, the victim, was parked in his 1977 Buick station wagon under the I-610 overpass at the intersection of Humanity and Allen Streets in New Orleans. Chapman was accompanied by his girlfriend, D.H., a minor.
While Chapman and D.H. were sitting in the station wagon, an armed man, later identified by Chapman's girlfriend as the defendant, John Brooks, suddenly pulled open the driver's side door. Brooks pointed his revolver at Chapman and stated "Give me what you got." D.H. then began to scream, while Chapman complied with Brooks' request and handed him some money. Brooks stated "That's all you got?" and then turned to D.H. and said "Shut up, bitch, shut up." When Chapman made a move towards Brooks, Brooks shot him in the front of the chin. The bullet went through Chapman's mouth and throat, opening up the carotid and vertebral arteries and causing massive blood loss from which Chapman ultimately died.
After being shot, Chapman's body slipped to the passenger side, falling across D.H.'s lap. Brooks then forced D.H. out of the station wagon and into his blue pick-up truck. Brooks drove D.H. to the St. Louis Hotel in New Orleans where he rented a room for three (3) hours from the owner, Murray Lacey. Brooks forced D.H. into the room, raped her, then drove her back to her neighborhood where she managed to elude Brooks.
The police investigation into the crime spree which had begun on August 23, 1986, initially focused on one Alonzo Wilhite. Wilhite was tentatively identified as the perpetrator of the Harrison and Chapman murders by the victims' girlfriends, Hilton and D.H., in photographic and physical line-ups.[1] In addition, Murray Lacey, owner of the St. Louis Hotel, also tentatively identified Wilhite as the man he had dealt with in the early morning of November 15, 1986. Thus, by December of 1986 homicide investigators considered Wilhite the leading suspect in the Harrison and Chapman murders as well as other murders and ancillary crimes.
Defendant, John Brooks, was arrested for offenses unrelated to the Harrison and Chapman murders on December 28, 1986.[2] On December 29, 1986, a New Orleans television station broadcast film footage of Brooks being moved from police lock-up to the Orleans Parish Prison. Both Hilton and D.H. independently of each other saw this broadcast and immediately contacted detectives, identifying Brooks as the man involved in the murders of Harrison and Chapman. Hilton, regarding the Harrison murder, and *369 D.H. and Murray Lacey, regarding the Chapman murder, subsequently confirmed the identity of Brooks as the perpetrator of the two murders in a physical line-up.
Brooks made his initial appearance in the Orleans Criminal District Court on December 29, 1986. Later that same day, while filling out paperwork with a Sergeant Morales in the police department's homicide office, Brooks made a spontaneous statement in which he claimed knowledge of and responsibility for several murders. This statement was not used in Brooks' trial for the murders of Harrison and Chapman, the case before this Court.
On the next day, December 30, 1986, Brooks was interviewed by three detectives, John Reynolds, Steve Nicholas, and Patrick Jones. The detectives were aware at that time that Brooks had at previous times been under psychiatric care. They nonetheless asked Brooks if he wanted to make a statement. Responding to Miranda warnings, Brooks stated that he did not have an attorney, nor did he want one to assist him. He then proceeded to confess to a series of crimes, including murders, armed robberies, and rapes, committed between June and December of 1986. The confession continued until Brooks grew weary, so the detectives returned early the next day, December 31, 1986, when Brooks again waived his Miranda rights, specifically declined the detectives' offer to provide him with an attorney, and continued with his confession.
During the confession detailed notes were taken by Detective Reynolds, who later produced a typed transcript of the notes. Although the detectives were later able to corroborate Brooks' confession regarding a number of the crimes he claims to have committed, including the two murders that form the basis of this prosecution, the occurrence of a significant number of these crimes has not been verified, or so this record reveals. On the afternoon of December 31, 1986, before detectives could return for a third interview planned for January 2, 1987, attorney John Reed contacted the New Orleans Police Department and stated that he was representing Brooks and that Brooks wished to make no further statements to the police.[3]
On February 19, 1987, Brooks was indicted on eight (8) counts of first degree murder. See LSA-R.S. 14:30 A(1). Pending trial, a Lunacy Commission was appointed by the trial court to assess whether Brooks was competent to assist his counsel and stand trial. On August 13, 1987, after receiving the report of the Commission and hearing further evidence, the trial court adjudged Brooks competent to proceed to trial.
The State later severed the indictment, electing to try the defendant on only four (4) of the eight (8) counts of first degree murder contained in the original indictment. Those four (4) murders are unrelated to the offenses which are the subject of the instant case. The State's initial prosecution went to trial in October of 1987, and Brooks was found guilty on all four (4) counts. The jury was unable to reach a unanimous verdict at the penalty phase, and the defendant was thereafter sentenced to four consecutive life sentences. Brooks' 1987 conviction and sentence were affirmed and are now final. State v. Brooks, 552 So.2d 1064 (La.App. 4 Cir. 1989) (TABLE).
Having failed to secure the death penalty for Brooks in his first trial, the State brought him to trial again, this time for the murders of Harrison and Chapman.[4] These two charges were among the four (4) counts of the original indictment which had been severed prior to Brooks' first trial. It is the result of this second trial which is the focus *370 of this appeal and this opinion. However, this is not the first time that this Court has addressed Brooks' second capital prosecution; defense counsel earlier sought review by this Court of a number of adverse rulings on pretrial motions made in the trial court.[5] In response to the defendant's application, this Court granted a writ, then rendered an opinion on those pretrial rulings in State v. Brooks, 541 So.2d 801 (La.1989) (hereinafter "Brooks (I)".
In Brooks (I), this Court addressed a number of assignments of error, the only ones relevant to this opinion being assignments dealing with the admissibility of Brooks' confession and the State's proposed penalty phase introduction of the unadjudicated prior offenses contained in Brooks' confession. Insofar as the confession was concerned, this Court stated that the record then before us was insufficient to make a final determination as to the confession's admissibility, and accordingly deferred that matter until postverdict proceedings.
We also found the record at that time insufficient for a final determination as to the admissibility of the evidence of unadjudicated prior offenses offered by the State. In addressing that matter, however, we chose to set forth specific criteria for the trial court to follow in determining the admissibility of this evidence. We held that
evidence of unadjudicated crimes at the sentencing phase of the trial will be admissible once a trial court determines: 1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing; 2) the proffered evidence is otherwise competent and reliable; and 3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is [the] focus of the sentencing hearing under La.C.Cr.P. art. 905.2.
Brooks (I), supra, at 814. We then remanded the case to the trial court for further proceedings not inconsistent with our opinion.
Following further pretrial motions, Brooks eventually went to trial for the Harrison and Chapman murders on February 19, 1991. The jury heard testimony from Debra Hilton and D.H. who were the girlfriends of the respective murder victims and who each positively identified Brooks as the murderer of their respective companions, Harrison and Chapman. In addition, Murray Lacey identified Brooks as the man to whom he had rented the room at the St. Louis Hotel where D.H. was raped. Furthermore, Detectives Reynolds, Nicholas, and Jones testified concerning the circumstances surrounding Brooks' confession of December 30-31, 1986, and that confession was introduced into evidence insofar as it described the murders of Harrison and Chapman. The detectives' testimony, both on direct and cross examination, included discussion of Brooks' waiver of his right to counsel after being apprised of his Miranda rights. The State also introduced further evidence, including the testimony of a ballistics expert and expert medical testimony dealing with the cause of death of each victim and additional evidence tying Brooks to the charged offenses.
The defense strategy consisted largely of attempting to discredit the reliability of the in-court identifications made by Hilton, D.H., and Lacey by recounting how each of these witnesses had earlier made at least a tentative identification of Alonzo Wilhite as the perpetrator. In addition, the defense offered Marie Roberts as an alibi witness. Roberts, a relative of Brooks, testified that Brooks had stayed with her and her husband in St. Joseph in Tensas Parish from the first or second of November until November 17th or 18th, a span including the dates of the Harrison and Chapman murders. Finally, the defense called Dr. Marc Zimmerman, a clinical psychologist, who testified regarding Brooks' mental retardation and, in an attempt to cast doubt on the reliability of Brooks' confession, opined that Brooks is easily manipulated and incapable of understanding abstract concepts like his Miranda rights. The jury also heard *371 testimony from Betty Jean Farrel, Brooks' mother.
In rebuttal, the State called only one witness, psychiatrist Dr. Kenneth Ritter, who was a member of the Lunacy Commission appointed to examine Brooks prior to his first trial. He testified that the Commission had found Brooks competent to stand trial. In addition, Ritter testified that although Brooks was slightly retarded, he was capable of understanding the difference between right and wrong as well as the concepts relayed by Miranda warnings.
On February 21, 1991, after considering all the evidence presented to it, the jury returned guilty verdicts on both counts, and the matter proceeded to the penalty phase. At an in camera conference held just prior to the opening of the penalty phase, the trial court ruled that it would allow the jury to hear Brooks' entire confession.[6] As part and parcel of this ruling, the trial court concluded that all unadjudicated offenses referred to in the confession, including those crimes the existence of which the police were unable to verify, met the standards for admissibility established by this Court in Brooks (I). On February 22, 1991, after hearing evidence which included the defendant's December 30-31, 1986, confession, the jury unanimously recommended that defendant Brooks be sentenced to death on both counts.[7] Brooks now seeks review of his convictions and death sentence in this Court.

II. Discussion
Brooks assigned four errors below, which we will now treat in turn.

A. The Motion to Suppress
Defendant assigns as error the trial judge's denial of a Motion to Suppress Brooks' confession. We find no error in the trial judge's ruling.
A motion to suppress the confession was originally filed in Brooks' first trial in 1987. The basis of this motion was that Brooks' waiver of his Miranda rights prior to his confession of December 30-31, 1986, was not knowing and intelligent, and that furthermore Brooks' mental retardation prevented him from giving voluntary statements in the custodial situation in which he was interrogated. See State v. Spooner, 368 So.2d 1086 (La.1979). In short, Brooks claimed that the State had failed to prove "beyond a reasonable doubt" that his confession was knowing, intelligent, and voluntary. State v. Seward, 509 So.2d 413 (La.1987).
The trial court conducted a hearing on Brooks' motion on May 4, 1987, and immediately thereafter denied the motion. This decision was based upon the testimony during the hearing of Detective John Reynolds and Sergeant David Morales. Sergeant Morales testified that Brooks was "Mirandized" prior to his statements on December 30-31, 1986. Detective Reynolds corroborated Sergeant Morales' testimony and further related Brooks' apparent willingness to speak with the detectives in order to tell "his side" of the story. The defense called no witnesses in support of its motion.
The defense moved to re-open the motion to suppress the confession on October 17, 1987, four days prior to Brooks' first trial, claiming that Brooks had been examined by a psychologist, Dr. Marc Zimmerman, and found to have organic brain damage. The State responded by stipulating that it would not use Brooks' confession at his first trial, effectively mooting the defendant's motion. However, during the penalty phase of Brooks' first trial, extensive testimony regarding Brooks' diminished mental capacity and its possible causes, including organic brain damage, was received into evidence.
*372 On February 5, 1988, the trial judge in Brooks' second trial, prompted in part by a defense motion for the appointment of a second Lunacy Commission because of evidence of Brooks' organic brain damage, granted a hearing on the defendant's attempt to reopen the motion to suppress. At this hearing, the only witness was Dr. Zimmerman, who testified that because of his brain damage Brooks was incapable of making a knowing, intelligent, and voluntary waiver of his constitutional rights. Following this hearing, the trial judge denied defendant's motion. That pretrial ruling and the trial court's refusal to appoint a new Lunacy Commission were later tentatively affirmed by this Court, although we pretermitted a final determination of the confession's admissibility until post-verdict proceedings because of the incomplete state of the record at that time. Brooks (I), 541 So.2d at 805-807, 814-815.[8] It is this same ruling, and apparently its precursors when viewed in light of the now fully developed record, to which Brooks assigns error.
In reviewing the propriety of the trial judge's ruling, we note that we are not limited to the evidence adduced at the hearing(s) on this motion, but rather may consider all pertinent evidence adduced at trial. State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979) (listing cases). See also State v. Brooks, 505 So.2d 714 (La.1987) (unrelated case). In this case, since an identical issue and identical parties are involved, and because at every stage of both of his trials Brooks has had the assistance of counsel and the ability to favorably develop evidence through cross-examination and compulsory process, we examine not only the evidence adduced at Brooks' second trial and its concomitant hearing on the motion to suppress, but also all relevant testimony adduced at Brooks' first trial and its related motions to determine whether Brooks' confession should have been admitted during his second trial.[9]
We review this extensive record in order to discern if Brooks first received a complete Miranda warning and then made a knowing and intelligent waiver of his constitutional rights prior to making any inculpatory statements. State v. Nelson, 459 So.2d 510 (La.1984), cert denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985), reh'g denied, 472 U.S. 1013, 105 S.Ct. 2715, 86 L.Ed.2d 729 (1985). In addition, we examine the totality of the circumstances under which Brooks' confession was made in order to determine whether the confession was voluntarily made. State v. Lewis, 539 So.2d 1199, 1201-1202 (La.1989); State v. Benoit, 440 So.2d 129, 131 (La.1983). This review is undertaken with full respect for the deference owed the trial court in its determination of a confession's admissibility. State v. Nuccio, 454 So.2d 93, 100 (La.1984). Although our jurisprudence accords the trial court deference in this area, a trial court's conclusions will not stand unless supported by adequate evidence. Id. See also State v. Thornton, 351 So.2d 480, 484 (La.1977).
At the outset, we observe that Detective Reynolds gave extensive testimony regarding the Miranda warnings Brooks received. In fact, Reynolds recited to the jury verbatim from the pre-printed rights form utilized by the New Orleans Police Department ("NOPD") in the same manner as when he had read that form to Brooks. The NOPD rights form contains an ample recitation of the prophylactic litany mandated by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We conclude therefore that the Miranda warnings given *373 Brooks were sufficient to fairly apprise him of his constitutional rights.
The next question we must address, and the central question raised by Brooks' assignment of error, is whether Brooks' waiver of his Miranda rights was a knowing and intelligent one, i.e. whether he was capable of understanding those rights and, with that understanding, nevertheless declined to avail himself of his constitutional protections. When the added factor of Brooks' acknowledged mental retardation is included in the calculus, the issue of the voluntary nature of Brooks' confession becomes enmeshed in the related, but distinct, question of the knowing and intelligent nature of Brooks' waiver. State v. Lindsey, 404 So.2d 466, 472 (La.1981) (citations omitted). Although our jurisprudence has consistently noted that diminished capacity may render a confession involuntary due to the confessor's inability to comprehend the ramifications of his actions, nonetheless we have also noted that the existence of a discernible mental defect does not invariably vitiate the ability to make a knowing, intelligent, and voluntary waiver of constitutional rights. Benoit, supra, at 131; Lindsey, supra, at 472. However, as the State concedes in its brief to this Court, although the defendant bears the burden of proving the existence of any mental abnormality which might render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary and obtained pursuant to a knowing and intelligent waiver of the defendant's constitutional rights. State v. Glover, 343 So.2d 118 (La. 1977) (on rehearing).[10]
Our review of the record indicates that the trial court was correct in its evaluation of Brooks' ability to comprehend, appreciate, and knowingly, intelligently, and voluntarily waive his Miranda rights. Prior to his first trial and pursuant to the appointment of a Lunacy Commission, Brooks was subjected to a skull x-ray and an electroencephalogram by Dr. Keith Ritter, a member of the Commission.[11] These tests revealed no indication of any organic abnormality in Brooks' brain. This finding of Dr. Ritter, a forensic psychiatrist, conflicts with the testimony of Dr. Marc Zimmerman, a clinical psychologist, who maintained throughout both trials that Brooks suffered from organic brain damage which impaired his ability to adapt to new situations and comprehend abstract notions, such as his Miranda rights. Dr. Ritter's negative findings were also challenged by Dr. Doris LeBlanc, a forensic psychiatrist and a defense witness during the second trial, who corroborated Zimmerman's claims of organic brain damage.
Even were we to concede that the defendant proved he suffered from a mental defect, the question of whether this defect impaired Brooks' ability to understand his Miranda rights remains. Brooks' evaluation by a plethora of psychiatric and psychological experts on both sides centered around three Intelligence Quotient ("I.Q.") tests administered to Brooks: two in 1982 and the third and most recent in August of 1987. On those tests Brooks scored, in chronological order, a sixty-seven (67), a forty-four (44), and a sixty-one (61). The State's experts seized upon these numbers to categorize Brooks as mildly retarded but functional, while Dr. Zimmerman focused upon the low score of forty-four (44) to characterize Brooks as mildly to moderately retarded. Dr. LeBlanc, the defense forensic psychiatrist, went further, declaring *374 Brooks to be moderately to severely retarded with possible brain dysfunction.[12]
Experts for both the State and the defense testified that I.Q. can change over time. Dr. Ritter, while conceding that a score of sixty (60) is the usual cutoff for determining competency to stand trial, was nevertheless impressed by, among other things, the fact that Brooks had learned how to drive in New Orleans traffic. In addition, Dr. Ritter noted that Brooks had also learned to drive a forklift, which he operated in conjunction with his employment for Goodwill. Dr. Ritter found that these accomplishments indicated a level of function and educability greater than that suggested by the results of Brooks' I.Q. tests alone. Furthermore, Dr. Hannie, a member of the Lunacy Commission appointed prior to the first trial, observed that although the defendant fared abysmally when writing skills were involved, he did quite well on tests requiring only verbal communication skills.
Were our consideration of this matter confined to the evidence recounted to this point, there would be a real doubt concerning whether the State had sustained its burden of proof. However, that doubt is dispelled when the facts noted above are considered along with the testimony of Dr. Ciro Juarez-Nunez, the psychiatrist in charge of the Orleans Parish Prison psychiatric unit. Dr. Juarez testified during the penalty phase of Brooks' second trial that Brooks was under his direct care from January 5, 1987, to February 23, 1989, and again from April 3, 1989, to February 18, 1991. Dr. Juarez related that Brooks had on four separate occasions attempted through feigned episodes of emotional disturbance to convince Dr. Juarez that he was crazy, requesting during these episodes that he be administered psychotropic medication. Based on these experiences, Dr. Juarez characterized Brooks as a malingerer, and noted that his attempts to imitate psychotic behavior were inconsistent with the psychological profile of Brooks proffered by the defense. Dr. Juarez also opined that Brooks was not mentally retarded, but merely illiterate, and certainly "educable." Dr. Juarez offered as evidence of his claims Brooks' faultless service while incarcerated and under Dr. Juarez's supervision as an "assistant tier representative," a group leader responsible for approximately fifteen (15) other patient-inmates over a five month span.
Dr. Juarez's testimony is supported by Dr. Hannie's findings in conjunction with the Lunacy Commission:
Malingering was evident. At times [Brooks] acted as if he could not understand or communicate, then he would become articulate in describing complex events.
Five experts, including Hannie, testified in hearings held prior to Brooks' first trial that Brooks was a malingerer. Even defense expert Dr. Zimmerman conceded that the twenty-three (23) point range between Brooks' lowest and highest I.Q. scores was "unusual;" furthermore, between the first and second trials Zimmerman was forced to raise his evaluation of Brooks' "mental age" from eight (8) years to somewhere between ten (10) and twelve (12) years old. This picture of Brooks as a man capable of selectively exercising discernment when it suited his purposes accords with the consistent and uncontroverted testimony of Detective Reynolds concerning Brooks' apparent frankness and coherence during the course of his confession. The extent to which the details of the Chapman and Harrison murders present in the confession were corroborated by eyewitness testimony at trial offers an additional factor for this Court to consider in evaluating the clarity of Brooks' mental processes at the time of his confession.
The trial judge made certain findings regarding the credibility of the witnesses, and in accordance with those findings gave greater or lesser weight to the opinions of the *375 experts who testified. We find that those determinations are supported by the evidence in the record and therefore affirm the trial court's ruling that the defendant's confession was voluntarily made pursuant to a valid waiver of his Miranda rights.[13] In addition, because defendant does not assign, and our review of the record does not reveal, any additional error in the guilt phase of Brooks' trial, we hereby affirm Brooks' murder convictions.

B. Other Crimes Evidence During the Penalty Phase
On August 14, 1990, the State served upon the defense notice of evidence of other offenses that it intended to present during the penalty phase. These other offenses included evidence of the four murders of which Brooks had been found guilty in his first trial, i.e., adjudicated offenses.[14] In addition, the State offered the testimony of Ernest Owens and Jimmy Milsap, both of whom were among the victims of Brooks' crime spree who survived. The State's notice concluded by declaring that it also intended to introduce evidence of "[c]rimes more particularly described by John Brooks in the oral statements made to Det. John Reynolds on December 30 and 31, 1986, as evidenced in the attached description of such statements."[15] The trial judge held no formal hearing on the admissibility of the unadjudicated offenses contained in the confession, including those yet to be verified by the New Orleans Police Department, but after a brief in camera conference held just prior to the opening of the penalty phase ruled that the confession was admissible in toto.[16]
In its oral reasons for admitting the confession in the penalty phase, the trial court found that the confession met the threepronged standard formulated by this Court pursuant to its pretrial review of this case. Brooks (I), 541 So.2d at 841. The trial court found specifically that the uncorroborated confession of Brooks was clear and convincing evidence of the commission of the unrelated crimes mentioned therein, that this evidence was "otherwise competent and reliable," and that these crimes had relevance and substantial probative value as to the defendant's character and propensities. See LSA-C.Cr.P. Art. 905.2.
Pursuant to the trial court's ruling, the jury during the penalty phase listened while Detective Reynolds read to them Brooks' confession, a confession containing descriptions of the four murders for which Brooks stood already convicted, the two murders for which he was being prosecuted, the two murders for which he remains under indictment, and some nineteen (19) separate incidents involving twenty-seven (27) other unadjudicated offenses. However, the State failed to present any evidence corroborating even just the existence of twenty-three (23) of the unadjudicated offenses referred to in the confession.[17] *376 In presenting these unsubstantiated claims to the jury the State called no victims or eyewitnesses to testify, offered no indictments or bills of information to verify that these offenses were being prosecuted, and failed even to present any evidence that the New Orleans Police Department had managed to match the alleged incidents to any unsolved cases or item numbers, i.e., reported incidents.[18] These are the facts to which we must now apply the standards this Court has declared should control the admission of such evidence.
Under the circumstances of this case, the trial court simply erred in finding that the aforementioned portions of Brooks' confession introduced during the penalty phase were reliable enough to meet the Brooks (I) standard. Brooks (I) requires that the evidence of unadjudicated unrelated offenses introduced in the penalty phase of a capital trial be proven by clear and convincing evidence and be "otherwise competent and reliable." Although uncontroverted defense admissions alone might under other circumstances be sufficient to establish the facts by clear and convincing evidence, Brooks' admissions must be considered along with the inability of the police to verify even the occurrence of many of the purported offenses contained in the confession. This circumstance raises the possibility that many of the crimes Brooks claimed he committed may never have occurred.
While we note that we find in this opinion that Brooks was competent to stand trial and capable of understanding and waiving his Miranda rights, these determinations do not lessen the prospect that Brooks voluntarily inflated the scope of his crime spree at the time of his confession. Detective Reynolds testified that Brooks made it clear that he was confessing to tell "his side" of the story; under such circumstances, given that Brooks knew retribution was nigh, the possibility of at least some exaggeration on his part is a valid concern. Certainly Brooks' mental retardation and erratic and unpredictable behavior should have raised a warning flag, and the failure of the police to verify a number of the alleged crimes should serve to heighten this concern.
While we are unprepared to say that extrinsic corroboration of unadjudicated other crimes contained in a defendant's confession is a necessary predicate to the admission of that confession in the penalty phase of a capital trial, we do note that such corroboration is a traditional and time-honored method of demonstrating the trustworthiness of such statements.[19] Such guarantees of trustworthiness *377 are particularly necessary in capital cases where the risk of fabrication or inaccuracy must be viewed with an eye towards the question to be determined by the trier of fact. In this case, such corroboration, if available and produced, would likely have cured the defects that we conclude cause the confession's admissions of unadjudicated crimes to fail the first two prongs of the Brooks (I) test. In this case, the State did not even attempt to demonstrate that Brooks' confession contained any guarantees of trustworthiness as to the alleged crimes whose existence the police were unable to verify. Such a showing, under the facts of this case, simply falls below the standard enunciated by this Court in Brooks (I).
For the reasons set out above, we find that the trial court erred in admitting at the penalty phase that part of Brooks' confession which contained references to multiple unadjudicated offenses not shown by clear and convincing evidence and not supported by competent and reliable evidence offenses which in fact may not have occurred. Furthermore, given the sheer volume of such inadmissible other crimes evidence which was presented to the jury during the penalty phase,[20] we find that this error incurably tainted the sentencing process and that the error therefore cannot be considered harmless. Thus, we reverse the jury's recommendation of death and order that a new sentencing hearing be held in accordance with the views expressed herein, and in particular in strict conformity with the Brooks (I) standards.

C. Other Matters
Brooks has assigned two additional errors; namely, that the trial court erred in medicating Brooks during the penalty phase of his trial, rendering him unable to assist counsel in his defense, and that the execution of a retarded individual like Brooks would entail a violation of Brooks' right to due process.[21] Due to our reversal of Brooks' death sentence and our order to conduct a new penalty phase trial, we find it unnecessary to address these two assignments of error which arise from penalty phase occurrences and therefore do not impact the result of the guilt phase of Brooks' trial. Furthermore, our disposition of this case obviates the requirement that we review Brooks' sentence for excessiveness. See LSA-C.Cr.P. Art. 905.9.

III. Summary
We affirm the trial court's ruling that Brooks was capable of understanding his Miranda rights and that he made a knowing, intelligent, and voluntary waiver of those rights prior to making his confession. We find therefore that the portions of Brooks' confession related to the Harrison and Chapman murders were properly admitted into evidence at the guilt phase of Brooks' trial. Based upon this conclusion, we affirm the *378 conviction of John Brooks on two counts of first degree murder. However, because of the erroneous admission of other crimes evidence during the penalty phase of Brooks' trial, we reverse the jury's recommendation of death and remand this case to the trial court to hold another penalty phase trial, should the State so choose to proceed.
CONVICTION AFFIRMED; DEATH SENTENCE REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
NOTES
[*] Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice Pike Hall, Jr. Pursuant to Rule IV, Part 2, § 3, Justice Harry T. Lemmon was not on the panel that heard and decided this case.
[1] Both Hilton and D.H. testified that they had not positively identified Wilhite as the perpetrator, but only as a man similar in build and appearance to him.
[2] Specifically, the day after his arrest Brooks was presented to the magistrate at his initial appearance on two charges of first degree murder for the murders of Diane Gibson and Darren Mercadel, and two charges of attempted murder.
[3] Reed represented Brooks for his arraignment but withdrew from representation on March 5, 1987. At that point, because of Brooks' indigent status, an attorney from the Orleans Indigent Defender Program was appointed who represented him through both of his capital trials, and who continues to represent Brooks for purposes of this appeal.
[4] The trial judge in Brooks' first trial, Judge Shirley G. Wimberly, Jr., refused to try Brooks a second time, citing the waste of State time and resources that would be involved in a second trial. In response to the trial judge's action, the State filed a motion to recuse Judge Wimberly on October 26, 1990. That same day Judge Wimberly recused himself and ordered the clerk of court to reallot the case to another section.
[5] Among these motions was a renewed Motion to Suppress Brook's confession. This motion was denied by the trial court, Brooks' confession being adjudged admissible. This result was the same as obtained in Brooks' first trial, although in that prosecution the State elected not to introduce the confession into evidence. See discussion at Subpart II(A), infra.
[6] The State nonetheless elected to redact from the confession a statement by Brooks concerning an offense against his sister when he was a juvenile and several questions by the detectives regarding crimes as to which Brooks denied involvement. The State conceded that the inclusion of these statements would be both irrelevant and prejudicial in the penalty phase.
[7] The jury verdict form listed the following aggravating circumstances, as required by LSA-C.Cr.P. Art. 905.4, as to both counts:

(a) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery.
(g) The offense was committed in an especially heinous, atrocious, or cruel manner.
[8] Specifically, we stated as follows:

The confessions of defendant are not in the record; thus, we have no knowledge of the contents of or the conditions under which such statements may have been made. Also not in the record is the testimony or the statements of the officers who testified at the initial hearing on the motion to suppress defendant's confession. Since the Court has not been provided with the transcripts necessary in order to determine the admissibility of the confession, we defer consideration of the merits to post-verdict proceedings in the event the confession is used and the defendant is convicted.
Brooks (I), supra, at 815.
[9] The trial judge in Brooks' first trial did not have to rule on Brooks' motion to reopen the suppression hearing prior to his first trial because the State agreed not to and did not use the confession in that prosecution.
[10] The State may attempt to make this showing through the opinions of experts; however, such opinions, helpful though they may be, are not controlling. State v. Lefevre, 419 So.2d 862 (La. 1982). The ultimate question is a deceptively straightforward one, i.e. whether the defendant was able to understand the rights explained to him and whether any statements given were given voluntarily. State v. Young, 576 So.2d 1048 (La.App. 1 Cir.1991), writ denied, 584 So.2d 679 (La.1991).
[11] Dr. Ritter's findings were concurred in by Dr. Ignacio Medina, a physician, and Dr. Thomas Hannie, Jr., a clinical psychologist, both appointed by the trial judge to the Lunacy Commission, and by Dr. Nancy Rummage, a psychologist, who was appointed to assist the Commission at the defendant's request.
[12] Dr. LeBlanc attributed Brooks' brain damage to complications experienced by his mother during his birth. However, Dr. LeBlanc also testified during the penalty phase of Brooks' second trial that during a second interview Brooks appeared more coherent and focused, a fact which she attributed to Brooks' treatment with Thorazine. At trial, defense experts dwelt upon Thorazine's psychotropic qualities while the State's experts insisted that in Brooks' case the drug was being administered as a sedative. Brooks was at one point sedated with the use of Thorazine following an outburst during the penalty phase of his trial.
[13] In his brief to this Court, the defendant claims that "[t]he confession was surrounded by suspicious circumstances," namely, that it was not simultaneously recorded either on video or audio cassette, that it was not signed, and that it was not a verbatim recitation of the defendant's own words. However, the defense never introduced any evidence to rebut the interviewing detectives' story that it was Brooks who adamantly refused to allow any video or audio taping of the confession, and further that it was Brooks who refused to sign the confession since he was unable to read it. The circumstances of the confession were related in their entirety to the court, which found the confession sufficiently reliable to be admitted into evidence, and to the jury, which found the confession sufficiently reliable to support a murder conviction and death sentence. The defense has not offered this Court any basis upon which to second-guess the trier of fact on this point, and we decline to do so.
[14] In Brooks (I), this Court noted that these first degree murder convictions could be used in the penalty phase of Brooks' second trial, but that the trial court risked reversal should those convictions be upset on appeal. See, however, Romano v. Oklahoma, ___ U.S. ___, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (a conviction subsequently reversed on appeal does not taint a recommendation of death if it is accurate when presented to the jury during the penalty phase of a capital trial). Given the finality of those convictions at this point, it is unnecessary for this Court to further address this aspect of its holding in Brooks (I).
[15] The "attached description of such statements" referred to was merely a copy of the transcription of Detective Reynolds' notes of his interviews with Brooks.
[16] But see Note 6, supra.
[17] Brooks' confession mentions eight (8) offenses to which the police were able to assign an item number, including one murder which Brooks denied committing but which was nonetheless one of the four (4) murders Brooks was convicted of in his first trial. In addition, eyewitness testimony by Ernest Owens and Jimmy Milsap verified the occurrence of four (4) other offenses, transpiring during two separate criminal incidents, Brooks claims to have committed. This leaves seventeen (17) instances of criminal conduct, involving twenty-three (23) unadjudicated other offenses, comprising armed robberies, aggravated batteries, and rapes, whose existence the police have been unable to corroborate by any means.
[18] The inability to produce any evidence that a police report was even filled out on a number of these unverified other crimes is particularly telling. In a case where a person is purportedly so fond of shooting people and where a number of these alleged other crimes involved gunshot wounds to various persons, it could reasonably be expected that there would be at least a minimal amount of NOPD paperwork generated as a result of Brooks' avowed activities. At least four of these incidents involved gunshot wounds to the alleged victims' stomachs or faces, wounds which would almost certainly require hospital treatment and would probably precipitate police involvement had they in fact occurred.
[19] An example of this is the corpus delicti rule, which provides that a criminal defendant cannot be convicted on his own uncorroborated confession without some extrinsic proof that a crime has in fact been committed. State v. Martin, No. 93-0285 (La. October 17, 1994), 645 So.2d 190; State v. Cruz, 455 So.2d 1351, 1355 (La.1984). Although not dispositive of the question of the admissibility of Brooks' confession, the rationale underlying the corpus delicti rule, i.e. "corroboration is an effective test of the trustworthiness of a person's inculpatory statements," is instructive. Martin, Slip Op., at 7, 645 So.2d at 195.

In addition, statements which fall within a number of the traditional hearsay exceptions convey, as a necessary concomitant to their status as exceptions to the hearsay exclusionary rule, an indicia of reliability which arises; from the circumstances in which these statements were made. Had Brooks' inculpatory statements been made in such a setting, we might be disposed to find that the uncorroborated portions of Brooks' confession were imbued with sufficient guarantees of reliability to warrant their admission. However, the only exceptions which the Louisiana Code of Evidence recognizes that might apply to Brooks' confession are LSA-C.E. Art. 801(D)(2)(a), "admission of a party-opponent," and LSA-C.E. Art. 804(B)(3), "statements against interest." The underlying rationale for allowing "admissions" into evidence is based upon the "adversary system" rather than any notion of the statement's reliability, and therefore "[n]o guarantee of trustworthiness is required in the case of an admission." Fed. R.Evid. 801(D)(2), Notes of Advisory Committee on 1972 Proposed Rules. Furthermore, Brooks' confession was made while he was undergoing custodial interrogation, and such confessions, although they may technically fall within the hearsay exception of LSA-C.E. 804(B)(3), have traditionally been viewed with suspicion by courts due to the incentives for prevarication in such circumstances. See, e.g., United States v. Flores, 985 F.2d 770 (5th Cir.1993).
[20] See Note 17, supra.
[21] In Brooks (I), this Court deferred the question of whether Brooks' retardation would render his execution a due process violation until the United States Supreme Court decided Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Brooks (I), supra at 801. Although we now defer this question again, we note that on the record currently before us, Brooks has made no showing that the degree of his mental impairment approaches that of Penry, has failed to demonstrate that his mental deficiencies rendered him incapable of acting at the level of culpability required for the imposition of the death penalty, and has failed to set forth any reasons why he is in any respect different from the large number of mildly retarded persons falling within his general psychological classification.