750 So.2d 1105 (1999)
STATE of Louisiana
v.
Mark HALL.
No. 98-KA-0667.
Court of Appeal of Louisiana, Fourth Circuit.
December 22, 1999.
*1106 Yvonne Chalker, Louisiana Appellate Project, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Harry F. Connick, District Attorney, Nicloe Barron, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Court composed of Chief Judge ROBERT J. KLEES, Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY.
KIRBY, Judge.
The defendant was charged by grand jury indictment, along with a co-defendant Larry Henry[1] April 6, 1995, with second degree murder. La. R.S. 14:30.1. He was arraigned April 10, 1995, and pled not guilty. He filed a motion to suppress a confession which was denied September 29, 1995. He filed a motion for appointment of a sanity commission. On February 15, 1996, the defendant was found unable to stand trial. On May 22, 1997, he was found able to stand trial. On September 8, 1997, a twelve member jury found the defendant guilty as charged. He was sentenced September 18, 1997, to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
Mary Ann Rogers, aunt of the victim Cleon Rogers, said she was standing outside cleaning the yard on the morning of the crime, February 7, 1995, and saw a blue car pull up with two people inside. "Larry" jumped out and started shooting her nephew, who ran and hid under a truck. "Larry" pulled him out from underneath the truck and continued shooting him with a sawed off shotgun. The driver sat in the car in the middle of the street waiting. Rogers had never seen the driver before, but she saw a wheelchair in the backseat. On cross, she said she did not know Henry or the defendant, but she learned their names from her nephew Alexander Williams, who had been on the other side of the street stopped at a red light in his car when the crime occurred.
Williams, first cousin of the victim, said he was stopped at the corner of Martin Luther King Boulevard and Baronne Street when he saw Henry get out of the car and start shooting. He saw the defendant driving the blue Oldsmobile Cutlass. He said he had known the defendant for three or four years and had seen him drive the car before.
Dr. Alvaro Hunt said the victim suffered three gunshot wounds, all fired at close range.
Detective Norman McCord testified he responded to the call. He found the victim had already been pronounced dead. On the scene, he found three spent Remington M-1 Winchester 12-guage, empty shotgun shells. Later, he learned the defendant's name from Williams. He went to the defendant's house where he found the defendant, his mother, and several small children. *1107 He informed the defendant that he was a suspect in the murder of Cleon Rogers. The defendant said that he did not know Rogers or Henry. At that point, his mother entered the room, and McCord told her that the defendant was a suspect in the murder. His mother told the defendant that he had better tell the truth. He then said that he had been driving the blue Cutlass, which belonged to his sister, and that it was parked in the back of the apartment. McCord impounded the car and obtained a search warrant for it. Protruding from under the front driver's seat was an empty box of Winchester 12-guage shotgun shells. In the trunk was a Mossberg box containing a box of empty Remington 12-guage shotgun shells. McCord took a formal statement from the defendant at the Homicide Office after advising him of his rights and obtaining a signed copy of a waiver of rights of arrestee form. He said prior to the signing he had read the defendant his rights twice, and that he did not force him to sign the form, and did not promise him anything in return for signing the document. He said that the defendant seemed to understand and was not confused. The defendant's confession was taped. The tape was played for the jury.
During the statement, the defendant said that he could read and write, he understood that he was under arrest, he understood the rights that had been read to him, he understood that he need not make any statement, that he had a right to remain silent, that anything he said could be used against him at trial, that he had right to consult with and obtain the advise of an attorney before answering any questions, that if he could not afford an attorney, one would be appointed, and that he had the right to have the attorney present at the time of any questions or giving of any statements. He said that he waived his rights with full knowledge. He then said that he and Henry were driving by the intersection, and that he did not know what Henry was going to do. Henry told him to stop the car. Henry had a gun and pointed it toward the defendant. The defendant did not know what to do, so he stopped. He heard shots, and blanked out. Henry got back in the car, pointed the gun at him, and told him to drive. The defendant asked him why he had shot the victim. The defendant said that he did not know the victim and did not know why Henry killed him. After the shooting, the defendant drove Henry home. He spoke to Henry the next day, and he told him to keep his mouth shut. The defendant told his mother, and she told him to turn himself in, but he was scared. At the end of the statement, the defendant said that no one had threatened or forced him, that he had given the statement of his own free will, that no one had promised him anything, and that the statement was true and correct to the best of his knowledge.
On cross, McCord said that he knew the defendant had a limp, that he had only a six grade education, and that he could read "a little bit." (Tr. p. 62.)
Patricia Hebert, owner of Elliot's Small Arms, identified a form stating that the defendant had purchased a Mossberg 12-guage shotgun on December 16, 1994. She remembered the defendant buying the gun because he had "messed up" the first form she had given him to fill out and had to fill out a second.
The defendant's mother, Angela Hall, said that the defendant had a sixth grade education, and that he had to attend special education classes because he had comprehension problems. She said the defendant did not have a driver's license, had never driven a car, and was very susceptible to suggestion. He was paralyzed in his left leg in one of several shootings. He formerly used a wheelchair, but could maneuver on crutches with a brace. She said Larry Henry is her nephew, and that when the police first came to her house, they were looking for him. They then asked for the defendant. She said that they did not tell the defendant that he was under arrest, and that he left the house under the impression that he would be returning. She said that on the morning of the crime, *1108 Henry had come to her house, had asked to borrow her daughter's car, and had left by himself.
Tawana Hall, the defendant's sister, said that she owned the blue Cutlass. She lent the car to Henry on the morning of the crime, and the defendant did not leave with him. She said the defendant did not have a driver's license and that she had never seen him drive.
Crystal Young, fiancee of the defendant, said the defendant took care of their son during the day, and that she had dropped the child off the morning of the crime, and left him in the bed with the defendant.
The defendant testified that he is unable to walk without a brace, and is unable to drive a car. He said that he had only a sixth grade education, was "slow" and could not understand everything that he reads. On the morning of the crime, Henry came to the house to borrow the car, but the defendant did not leave with him. He said that when he made the statement, he did not know that he was under arrest, thought that he was going to go home, and was told in fact that if he cooperated he could go home. He said that a friend paid him $50.00 to buy the gun for him. He never met the victim, and had never heard his name until he was taken to jail.
Tory Hall, cousin and "big brother" to the defendant, said that he had received threats from Williams.
On rebuttal, the State called Deputy Warren Martin, who said that he had taken the defendant downstairs when court was in recess during lunch, and that he did not limp.

ASSIGNMENT OF ERROR ONE:
The defendant argues his statement should have been suppressed. Specifically, he argues that he could not have knowingly and intelligently waived his rights because of his diminished mental capacity.
A reviewing court is not limited to the evidence introduced at the hearing but may consider all pertinent evidence from the trial. State v. Green, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280, citing State v. Brooks, 92-3331, p. 10 (La.1/17/95), 648 So.2d 366, 372.
In both Green and Brooks, the defendants contended that their confessions should have been suppressed because their mental retardation and brain dysfunction prevented them from making a knowing and intelligent waiver of their rights. In Brooks, which was a direct appeal to the Supreme Court because the defendant received the death penalty, the court discussed the long-standing jurisprudential rule involving confessions by persons with a mental abnormality:
Although our jurisprudence has consistently noted that diminished capacity may render a confession involuntary due to the confessor's inability to comprehend the ramifications of his actions, nonetheless we have also noted that the existence of a discernible mental defect does not invariably vitiate the ability to make a knowing, intelligent, and voluntary waiver of constitutional rights. [Citations omitted.] However, as the State concedes in its brief to this Court, although the defendant bears the burden of proving the existence of any mental abnormality which might render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary and obtained pursuant to a knowing and intelligent waiver of the defendant's constitutional rights. State v. Glover, 343 So.2d 118 (La.1977) (on rehearing). [Footnote omitted].
Brooks, p. 12, 648 So.2d at 373.
In Brooks, the defendant had been subjected to several evaluations by both the defense and the State. Three I.Q. tests administered over a five year period showed scores of 67, 44, and 61. The State's experts, based on these scores, considered that Brooks was mildly retarded but functional. One of the State's experts also relied on the fact that Brooks had *1109 learned to drive in New Orleans and operated a forklift in conjunction with his employment for Goodwill. These accomplishments indicated a higher level of functioning than the tests scores may have. The defense experts, in contrast, believed that the defendant was moderately to severely retarded with possible brain damage. The court on review indicated that, if only the evidence to that point were considered, "there would be a real doubt concerning whether the State had sustained its burden of proof." Brooks, p. 14, 648 So.2d at 374. The court then reviewed other evidence, including testimony at the penalty phase of the defendant's trial. There, Dr. Juarez, the psychiatrist at Orleans Parish Prison, testified he had Brooks under his direct care several times during which the doctor saw evidence of malingering. Furthermore, while incarcerated and under Dr. Juarez's supervision, Brooks had been a tier representative responsible for approximately fifteen patient-inmates. Other experts testified that the defendant was possibly malingering or was capable of manipulation, including during the course of his confession. The court also considered defendant's confession itself and the extent to which its details were corroborated by the facts brought out at trial and found that to be "an additional factor for this Court to consider in evaluating the clarity of Brooks' mental processes at the time of his confession." Brooks, p. 15, 648 So.2d at 374. Therefore, because the trial court's ruling denying the motion to suppress the confession was supported by evidence in the record, it was affirmed.
The circumstances in Green were similar to those in Brooks except that, on appeal to this Court, this Court reversed the trial court's denial of the motion to suppress the confession. State v. Green, 92-2700 (La.App. 4th Cir.3/15/94), 634 So.2d 503 (Judge Byrnes dissenting). The testimony from the defense expert in Green was:
In support of his claim that he did not knowingly and intelligently waive his rights, at the motion to re-open the suppression hearing defendant presented the testimony of Dr. Mark Zimmerman, qualified as an expert in forensic psychology. He testified that he spent about nine hours testing and interviewing defendant. Dr. Zimmerman administered the following tests on defendant: 1) Benton Visual Retention Test, a test of perceptual motor abilities; 2) screening test for, and the Luria Nebraska Neuropsychological Battery, a test for brain dysfunction; 3) Weschler Adult Intelligent Scale, an intelligence test; 4) Wide Range Achievement Test, a test of academic abilities; 5) Personality Assessment Inventory, an objective personality test; 6) Minnesota Multiphasic Personality Inventory, an objective personality test; 7) Rorschach, a projective personality test; 8) Mouse-Tree-Person Technique, a projective personality test.
Dr. Zimmerman found that defendant had an I.Q. of 65, which put him in the mildly mentally retarded range, or the educable range of retardation. Defendant's mental age is approximately ten years. Although defendant completed the ninth grade and was in the tenth grade when he dropped out of school, his functioning in reading and spelling is below the third grade level and in arithmetic is at the fifth grade level. Dr. Zimmerman also found brain dysfunction considering defendant's education level, with the parts of his brain affected being those associated with academic abilities and his ability to process information his intellectual abilities.
Dr. Zimmerman reviewed the waiver of rights form signed by defendant and went over it with defendant, and concluded that defendant found the form difficult to read and could not adequately explain many of the words on the form such as "privilege" and "waive". Reading the form to defendant at approximately the speed he heard on the taped confession, Dr. Zimmerman found that defendant could not keep up; he could not understand the form. Dr. Zimmerman stated that he thought defendant could be made to understand his *1110 Miranda rights, but it would be very difficult for him to understand using the wording on that particular waiver form.
Green, pp. 6-7, 634 So.2d at 507. Dr. Zimmerman also testified that Green would probably portray himself as understanding things that he did not so as to appear normal.
The State presented no expert testimony in Green. The police officer who obtained his confession testified that he was satisfied that the defendant understood his rights. The officer did not personally determine if the defendant could read or write. In reversing the trial court, this Court stated:
Given the uncontradicted testimony of Dr. Zimmerman establishing defendant's mental retardation and his brain dysfunction, we cannot find that defendant made a knowing and intelligent waiver of his constitutional rights. With Dr. Zimmerman's testimony that defendant simply did not have the intellectual capacity to understand those rights and, in fact, did not understand his rights, the trial court clearly erred in refusing to suppress defendant's confession due to his diminished mental capacity. Considering all of the evidence presented, the State failed to prove that defendant knowingly and intelligently waived his constitutional rights prior to confessing to the murder of Pamela Block.
Green, p. 8, 634 So.2d at 508.
On review, the Supreme Court noted that the issue presented by this Court's opinion concerned the defendant's ability to comprehend the Miranda rights. In considering whether the State met its burden of proving a knowing and intelligent waiver of his rights by the defendant, the court first noted that the detectives, who were experienced, Mirandized the defendant several times and "at no time did he articulate or in any other way evidence any lack of comprehension of his rights to remain silent or to have any attorney present." Green, p. 12, 655 So.2d at 281. Next, the court noted that the defendant's own two tape-recorded statements constituted "testimony" to show that the officers had read his rights to him and inquired if the defendant understood them; both times the defendant had expressly waived his rights. Id. The only evidence, in the court's view, which rebutted this evidence was the testimony of the defense expert. The court concluded that the State met its burden. A factor, in the court's opinion, was that in the progression of the defendant's two statements, the first represented an attempt to exonerate himself from culpability for the murder, but over time, the statements evolved as the defendant was presented with additional facts. The court found that this "evolution" revealed "a mental agility and adaptability which cannot be readily associated with the diminished capacity found by the court of appeal." Green, p. 15, 655 So.2d at 282. Furthermore, as in Brooks, the court considered "the extent to which extrinsic facts, i.e. the location of the gun, the details of the crime scene, etc., corroborated Green's ultimate confession." Id., at 283. The court further explained that the accuracy of the confession was not the issue:
However, when faced with a claim that the defendant's mental processes are so dysfunctional as to preclude a full understanding of those rights, any facts which shed light upon the functioning of that defendant's mental processes are relevant and pertinent evidence which the trial court is entitled to consider.
Green, p. 15, 655 So.2d at 283. The court further found that the trial court was justified in relying upon the defendant's familiarity with the criminal justice system because it tended to show that the custodial interrogation was not an experience foreign to Green, and that prior Boykinizations indicated a repeated exposure to Miranda rights and was relevant.
In this case, Dr. Raphael Salcedo, a clinical psychologist, testified February 15, 1996, that he and Dr. Ritter had examined the defendant that morning. He said *1111 that they had found the defendant to be substantially retarded, unaware of the nature of the charges against him, unable to understand the available defenses, unable to distinguish between available pleas, and unable to assist his attorney. He said the defendant appeared to be unable to recall or relate facts pertaining to his actions or whereabouts, unable to assist in finding witnesses, and unable to make simple decisions in response to explained alternatives. He did not appear to be able to testify in his own defense, although the stress of trial would not likely cause his mental condition to deteriorate. He said the defendant was prone to suggestability. The parties stipulated Ritter's testimony would be the same, and the defendant was sent to Feliciana Forensic Facility.
On May 22, 1997, Dr. Mallek, a forensic psychiatrist, said that he had examined the defendant that morning, and that his behavior was not different than it had been over the previous eight months. He said:
Although he has a clear understanding of the proceedings and knows the answers which he has verbalized to different staff members at the hospital, when he is asked about it officially and you ask for an answer, he responds to each question the same, "I don't know." He did this startingHe was admitted back on August 13, 1996 to the hospital. And since then on numerous occasions has exaggerated his symptoms. After being there for several months, came out and told one of the staff members that he was advised to act crazy and to exaggerate his symptoms so that he could not be prosecuted. He was also involved in an incident fifteen days after being admitted into the hospital where he had kidnapped and hijacked one of the vans and there were three other individuals involved along with Mr. Hall. And they brought the van to New Orleans and they were on the run for twenty-four hours prior to their being arrested again and sent back....
He has been administered several tests while he's been at the hospital and in each one of the tests he has not given his full effort. For instance, his IQ testing, he came across as being mildly retarded, but the psychologist who administered those tests felt that Mr. Hall was not giving his full effort.
(Tr. 5/22/97 p. 3.)
Mallek said that when the defendant spoke to his peers and was not being observed, he acted "fine." While at the hospital, the defendant required no treatment, and Mallek thought him a malingerer.
Salcedo testified that he had been able to examine the defendant three times. On the morning of trial, "He was able to tell me what he was charged with. He gave rudimentary correct answers to the roles of various courtroom participants. He actually gave better responses today than he ever has. So much so that actually I believe that I can say that he meets the Bennett criteria today regardless of the issue of malingering." (Tr. 5/22/97 p. 19.) He said that the defendant was functioning at the upper end of the mild mentally retarded range. He said that the defendant had avoided getting into trouble in the past by acting "silly" and by exaggerating his condition.
In this case, we find that the state carried its burden of proving beyond a reasonable doubt that the confession was voluntary and obtained pursuant to a knowing and intelligent waiver of the defendant's constitutional rights. The defendant was found to be only mildly mentally retarded. He was seen interacting with his peers in a normal fashion when not being watched. He admitted to a hospital employee that he was acting so that he would not be prosecuted. The doctors thought that he was exaggerating and was a malingerer. While in the hospital, he was able to mastermind the hijacking of a vehicle and an escape. Nothing suggests that diminished mental capacity prevented the waiver of his rights from being knowing or voluntary.
This assignment is without merit.

*1112 ASSIGNMENT OF ERROR TWO:

The defendant argues the evidence was insufficient.
The Fifth Circuit reviewed the law directly on point in State v. Meyers, 95-750, 96-395, 96-35 (La.App. 5th Cir. 11/26/96), 683 So.2d 1378, 1382-1384:
In evaluating the sufficiency of the evidence, the standard to be used by the appellate court is whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988).
LSA-R.S. 14:30.1 provided in pertinent part:
A. Second degree murder is the killing of a human being:
[95-750 La.App. 5 Cir. 7] 1) When the offender has a specific intent to kill or to inflict great bodily harm....
Additionally, LSA-R.S. 14:24 provided:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
However, under LSA-R.S. art. 14:24, not all principals are automatically guilty of the same grade of offense. One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. Thus, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987), rehearing denied, 484 U.S. 1021, 108 S.Ct. 737, 98 L.Ed.2d 684 (1988). It is not enough to find merely that his accomplice had the necessary mental state, since this intent cannot be imputed to the accused. State v. Holmes, 388 So.2d 722 (La.1980).
Thus in order to support a conviction as a principal to second degree murder, the State must show that the defendants had specific intent to kill or to inflict great bodily harm. See State v. Francis, 486 So.2d 346 (La.App. 3rd Cir. 1986), writ denied, 492 So.2d 1216 (La. 1986).
Specific intent is: "that state of mind which exist when the circumstances indicate that the offender actively desired the prescribed [95-750 La.App. 5 Cir. 8] criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Since specific intent is a state of mind, it need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. See State v. Graham, 420 So.2d 1126 (La.1982).
When circumstantial evidence is used to show specific intent, LSA-R.S. 15:438 should be considered as it provides a rule regarding the use of such evidence. The rule directs the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove, and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Lilly, 468 So.2d 1154 (La.1985).
The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard. State v. Huizar, 414 So.2d 741 (La.1982).
In support of their contention that they lacked the requisite criminal intent, Meyers and Davis assert that the evidence only established that the former was the driver of the Cutlass and that the latter was a passenger and that such evidence does not support a finding of specific intent to kill or to inflict great bodily harm.
In State v. Smith, 26,661 (La.App.2d Cir. 3/1/95), 651 So.2d 890, writ denied, *1113 95-0918 (La.9/15/95), 660 So.2d 458, a case involving the offenses of second degree murder and attempted second degree murder resulting from a drive-by shooting, the codefendant Gibson, who was the driver of one of the three cars that participated [95-750 La.App. 5 Cir. 9] in the shooting, argued that he lacked the requisite criminal intent.
Prior to the shooting, Gibson was present at a party in a field when a statement regarding a drive-by shooting on South 4th Street was made. A large group of people in about eight cars then left the field and drove down South 4th Street and Gibson was driving one of the cars. However, no shooting occurred at that time and the group later returned to the field. Subsequently, three cars left the field and Gibson was again driving one of the cars. Codefendant Smith was sitting in the front passenger seat of Gibson's car while Harris, Daniels, Bradford and Davis were sitting in the rear seat. Gibson drove to his residence and a female identified as his girlfriend exited the car. Gibson then drove to the corner of South 4th Street where other cars lined up behind him. Someone from another car instructed Gibson to turn his lights off, and after he had done so he slowly drove down South 4th Street. Just prior to the shooting, Harris, who was sitting in the middle of the rear seat, saw co-defendant Smith with a gun and Davis, another rear seat passenger, was also able to see the gun in defendant Smith's hand laying in his lap. Following the shooting, Gibson drove away at a faster rate of speed, and according to Harris, Gibson made no statement after the shooting as if he was surprised by the incident.
In finding the evidence sufficient to convict Gibson, the Court stated the following:
... The state proved that Gibson had the specific intent to kill or inflict great bodily harm as well as the requisite knowledge. Finally, this evidence was also sufficient to [95-750 La.App. 5 Cir. 10] eliminate any reasonable hypothesis of innocence. First, Gibson was seen at the party in the field along with the other defendants and drove a car down South 4th Street one time previously before driving back for the shooting. Second, upon arriving at the corner of South 4th Street, Gibson assumed the role of the lead vehicle. Third, when instructed by someone in another car to turn off his lights, he readily complied. Fourth, witness Harris was able to see from the back seat that defendant Smith had a gun. It was reasonable for the jury to conclude that if Harris could see the gun from the back seat, then Gibson could also see it from where he was sitting in the front seat next to Smith. Finally, according to Harris, Gibson made no statement after the shooting as if he was surprised by the incident.
Thus, as the state contends, the jury could conclude that Gibson aided and abetted in the commission of the crime by giving his co-perpetrators the opportunity to kill or inflict great bodily harm. He drove to the crime scene, even if it was under the instruction of someone else, where he had already been once that evening. He stopped at the corner and turned off his lights. Passengers in Gibson's car had guns and fired shots at people outside of the house. This assignment is without merit.

State v. Smith, 651 So.2d at 900.
In the present case, neither Meyers nor Davis tried to assist the victim, George, after the shooting. They did not call the police to report the shooting or give any statement regarding the murder to anyone. Meyers drove the Cutlass to the scene and Davis watched the incident thru the car window. Although there was no direct evidence presented that either Meyers or Davis knew Delmar was armed, it can easily be assumed that the jury believed that all three knew exactly what their purpose was in confronting George on the street that night. This was a drive-by shooting quite common in the lives of *1114 drug dealers and the participants here all knew that Delmar intended to shoot Samuel George. They were definitely not an [95-750 La.App. 5 Cir. 11] innocent driver and passenger in the car.
In this case, the jury heard evidence that the defendant drove Henry to the location, stopped in the street, and waited while Henry shot the victim, then dragged him out from under a truck and continued shooting him. The defendant allowed Henry back into the car and drove him home. He did nothing to stop Henry, did nothing to help the victim, did not report the crime, and lied to the police when they first confronted him. He said he did not know Henry when in fact Henry was his cousin. They jury also heard evidence that two months before the crime, the defendant purchased a gun similar to the one used, and a box used to hold such a gun was found in the trunk of the car which was parked behind the apartment where the defendant lived in. The jury heard that the defendant had great difficulty walking, and yet a deputy sheriff said that he walked without a limp when court was in recess. The jury chose not to believe the defendant when he stated in his confession that he did not know that Henry was going to shoot the victim. There is no reason to overturn the jury's finding.
The evidence presented was sufficient to support the conviction. This assignment is without merit.
For the above stated reasons, we affirm the conviction and sentence.
AFFIRMED.
NOTES
[1] Henry evidently died before he could go to trial.