J^PLOTKIN, Judge.
On March 20, 1997, the defendant-relator, Eugene Brown, was indicted by a grand jury on three counts of armed robbery, one count of attempted armed robbery, and one count of second degree murder under the felony-murder doctrine. The defendant entered a plea of not guilty on April 2, 1997. On June 1, 1998, after a hearing, the defendant’s motion to suppress the confession was denied by the trial court. It is from this ruling that defendant seeks supervisory writs. We grant the writ, but deny relief.

FACTS:

On January 16, 1997, at 9:00 p.m., the defendant, seventeen years old, left his grandmother’s house in the company of his cousin, James Bryant, age twenty. They were both on bicycles, riding on different sides of the street. While still operating his bicycle, James approached a pedestrian, produced a gun, and tried to rob the *260 man. The potential victim pulled out a gun and shot James, ultimately killing him.[1] The defendant stopped his bicycle but was not shot by the attempted |srobbery victim. After the abortéd robbery, the defendant returned to his grandmother’s home and told her James had been shot. Shortly after midnight, the defendant was arrested at his grandmother’s house by N.O.P.D., then transported to the Third District station. At approximately 4:15 a.m., the defendant gave a tape-recorded statement.
According to the defendant’s statement, a transcript of which is provided with the writ application, James Bryant had been engaged in robberies for two or three years. Some of those robberies were perpetrated with a person the defendant knew only as “Tank.” The defendant had begun to participate in the robberies a week and a half before James’s death; he had participated in up to four robberies in that time. The defendant denied ever having a gun during any of the robberies. He described one robbery, not the one resulting in James’s death, in which James shot the victim with a pistol; during that robbery the defendant stated that he was standing on the corner. Generally, the robberies occurred when the defendant, James, and Tank would ride around in Tank’s car until they spotted a pedestrian. James, armed with a shotgun and/or a pistol, would demand the victim’s money. The defendant admitted exiting the car during the robberies, and on one occasion advised the victim to “Hurry up, they are not playing with you” although the police report of that incident indicated that the defendant said, “If you don’t hurry up, I’m gonna shoot you.”
The defendant was then questioned in greater detail about the events leading to James’s death. Earlier in the evening he and James went to the house across the [¿street from their grandmother. James needed a bicycle so defendant asked George Fallen for a bicycle. According to the defendant, he punched Fallen in his chest because he “was playing with him.” James produced a gun, which the defendant grabbed by the handle, then gave back to James. James pointed out a bicycle and asked if it was the one that Fallen was going to let him use; Fallen indicated it was. The defendant responded to further questioning which clarified that initially Fallen refused to let them have a bike, but after the defendant hit him and the victim saw the gun, he agreed to give up the bike. According to the defendant, the bike he had also came from inside Fallen’s house.
After leaving Fallen’s house, James and the defendant rode to a store at Orleans and Broad, then down Carrollton. James told the defendant he was going “hustling” which meant he was going to rob someone. They rode around a neighborhood until they came upon a pedestrian. The defendant passed him up and rode to the corner where he stopped. When he looked back, James was trying to rob .the man with a pistol. The defendant heard four shots and rode away. He returned to Fallen’s house where he gave him his own bike, then he went to his grandmother’s home where he told her what had happened. The defendant told his grandmother that James had been shot, although he denied to the police officers that he had seen James actually get shot.
With his writ application, the relator has provided a portion of the December 17, 1997, motion hearing transcript. The portion provided is the testimony of Sergeant Bruce Little who took the defendant’s tape-recorded statement.[2] Sergeant *261 |fiLittle testified that, at the time of the defendant’s arrest, Detective Green was with him. At the time the statement was taken, Detectives Irvin Bush and Sherman Defillo were present. Sergeant Little stated that he advised the defendant of his Miranda rights three times, verbally at the time of the arrest, at the station at which time the defendant signed the waiver of rights form, and again at the commencement of the tape-recorded statement. Each time, the defendant indicated that he understood and waived his rights.
During cross-examination of Sergeant Little, it was established that the defendant was formally arrested at 2:00 a.m., the waiver of rights form was executed at 2:40 a.m., and the statement commenced at 4:15 a.m. Dining this period the defendant was sitting at a desk in a large room at the Third District. Various police officers may have spoken with the defendant during that time. The defense counsel elicited the fact that Sergeant Little did not actually assist the defendant in completing the waiver of rights form, and therefore he was unable to say if the defendant did it himself or if it was done at the defendant’s direction by Detective Defillo. Sergeant Little did testify that as the supervisor of the investigation he was present, although his name was not reflected on the waiver of rights form; only Detective Defillo and Detective Green’s names were present as witnesses.
Sergeant Little testified that he never determined what the defendant’s educational level or school attendance record was. The defendant at some point told the sergeant that he could not read. Therefore, Sergeant Little testified, he was:
[«so careful as to slowly advise him of his rights on three different occasions and asked him if he did fully understand his rights. And he indicated that he did, he just had trouble reading.
Sergeant Little did not ask the defendant to explain the rights back to him.
At the conclusion of Sergeant Little’s testimony, defense counsel asked that the matter be held open until the police officers who had been subpoenaed by the defense could be present. However, the record before this Court does not indicate if any other police officers ever testified in this matter. The only other transcript provided by the relator is the May 13,1998 testimony of an expert in psychology, Dr. Fred Davis. Dr. Davis testified that, at the request of the defense, he evaluated the defendant on December 5, 1997, and December 12, 1997, for a total of five hours. His evaluation, which included reviewing school and Social Security records on the defendant, was for the purpose of determining whether there was any psychological data which would bear on the issue of whether the defendant was capable of making a knowing, intelligent, and voluntary waiver of his rights.
Dr. Davis testified that the defendant’s school records dated back to April 1991 when the defendant was age eleven. Various tests at that time, including the Wex-ler Intelligence Scale test given in November 1991 for an S.S.I. evaluation, showed that the defendant had a verbal I.Q. of 69, a performance I.Q. of 71, and a full scale I.Q. of 69, which would place the defendant at the “top end of the mildly, mentally retarded range.” The Woodcock Johnson test, which measures academic achievement, showed that the defendant at the age of eleven was reading at the first-grade level while his math skills were in the middle of the second grade level. Overall, the defendant “was functioning in the upper end of the upper end of the Lmildly mentally retarded range of intellectual capacity.”
Dr. Davis re-administered a Wexler Intelligence Scale test to the defendant in December 1997. The results were comparable to those shown in 1991. The defendant had a full-scale score of 68, a verbal I.Q. of 68, and a performance I.Q. of 70. The Woodcock Johnson test results in December 1997 showed that the defendant was reading at grade level 1.7, instead of *262 the 1.3 level shown in the 1991 test. His overall scales were at the third grade level, again the same as in 1991. His written language score was at the first grade level. Dr. Davis also administered a Listening Comprehension Subtest which is designed to show the capability of understanding spoken language; the defendant scored at the second grade level. Dr. Davis explained that this score indicated that, if a person spoke to the defendant as if to a second grade child, the defendant would be able to understand “pretty well.” However, if the defendant was spoken to as if he were an eighth grader, he might understand some of the words and simple ideas, but that most of the context would not be understood.
Dr. Davis also testified regarding the research of Thomas Rousseau, who specifically studied the issue of understanding and intelligently waiving legal rights, and developed a test to evaluate that ability when the person has a limited capacity. Dr. Davis conducted this test with the defendant, which consisted of reading each right to the defendant, asking him what it meant, and having the defendant explain the meaning in his own words. Dr. Davis found that the defendant showed a poor understanding of the Miranda rights when he read them to him from the waiver of rights form.
Dr. Davis also testified at some length regarding another factor which he | sbelieved would militate against a determination that the defendant’s waiver of rights was voluntary. Dr. Davis testified that he was told that Detective Defillo spoke at length with the defendant about waiving his rights and encouraged him to do so; Defillo allegedly is the brother-in-law of the defendant’s aunt, his mother’s sister. According to Dr. Davis, the defendant told him that Detective Defillo knows him well and spoke with him privately. The defendant said that Detective Defillo encouraged him to sign by stating that, “If you will sign this waiver, everything’s going to be okay.” Dr. Davis explained that the defendant would be very suggestible and easily influenced by people in his family or that are in a position of authority over them because retarded persons in general rely upon those type of people to help them make decisions that they are unable to make for themselves.
Dr. Davis ultimately testified that, in his expert opinion, the defendant would not have been able to understand and knowingly and voluntarily waive his rights “under the circumstances in which they were presented to him.” The doctor’s opinion was based on the defendant having been read his Miranda rights as reflected in the audiotape. On cross-examination, he further testified that even if the defendant had been read his rights in the same fashion more than once, the defendant would not have understood it any better unless they were paraphrased However, Dr. Davis also testified that an average first grader, the level at which the defendant functions, would most likely say that he understood the rights.
The State during cross-examination asked Dr. Davis if it would make any difference that the defendant had been arrested three times previously and had been advised of his rights before. Dr. Davis indicated that he was not aware of the prior arrests; he never expressly answered the question except to state that the defendant j 9has no ability to “manage concepts and do abstract thinking.” The doctor conceded that the defendant’s “episodic memory” or ability to recall events is “reasonable.” The defendant’s inability was instead centered on a lack of “working memory” or a short attention span which limited his ability to process information, think about it, analyze it, then decide the implications of that information.

DISCUSSION:

In cases such as the case sub judi-ce, which involve allegations of diminished mental capacity, the State bears the burden of proving that the defendant voluntarily, knowingly and intelligently waived his rights, but, the defendant has the bur *263 den of proving diminished capacity sufficient to vitiate an otherwise valid waiver. Because our review of the record unequivocally reveals defendant voluntarily waived his rights, we will proceed to a discussion of whether or not he did so knowingly and intelligently. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 280.
To determine if the defendant knowingly and voluntarily waived his rights, we must look to the “totality of the circumstances,” including the background, experience, and conduct of the accused. Id. (citations omitted). We note that our review is not a de novo review, but rather, is undertaken with the deference owed the trial court because the trial court is in a better position to weigh the credibility of key witnesses. State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366, 372.
Initially, we observe that Detective Little testified unwaveringly that he gave the defendant his Miranda warnings on three separate occasions, and, after |, nlearning defendant was illiterate, did so very slowly and deliberately. The third waiver is in the audiotaped statement upon which the trial court relied in denying the motion. At no time did the defendant express his inability to comprehend his rights. Furthermore, the fact that defendant cannot read does not necessarily indicate that he suffers from that level of diminished capacity necessary to vitiate his consent.
Also, defendant has been arrested on three occasions prior to the instant charges. Presumably, he was Mirandized on those occasions and “this ... is relevant to the trial judge’s appreciation of [defendant’s] understanding of his rights.” Green, 655 So.2d at 283 (citations omitted). This is not a situation where the defendant is completely ignorant regarding what he was experiencing; he is familiar with his constitutional rights and what occurs when someone is arrested.
Dr. Davis testified defendant has a lack of ability to process and analyze information. However, the defendant’s attempt to exculpate himself from the more serious aspects of the alleged repeated criminal conduct while confessing to the more generic role of a bystander shows he is capable of understanding the need for deliberate and careful answers during the process of confessing. For example, the victim of one of the robberies told the police defendant threatened him, saying, “If you don’t hurry up, I’m gonna shoot you.” However, during the interrogation, defendant attempted to recant that statement and alleged he actually said, “Hurry up, they not playing with you.” Moreover, the defendant places most of the blame for all of the crimes on his cousin, James Bryant, who was killed and cannot In defend himself from defendant’s allegations. Also, defendant claims he does know the real name of “Tank,” the third perpetrator of the prior armed robberies. He also claims that he has never seen Tank because he always wears a mask and does not know where Tank fives. This testimony also manifests greater understanding and clarity of thought processes at the time of the confession than Dr. Davis’s testimony would suggest. It is incomprehensible that defendant never saw Tank’s face during the time period they were armed robbing people or that defendant can give absolutely no description of Tank. Defendant’s inability to tell the police more about Tank reveals his ability to comprehend the possible repercussions associated with inculpating one’s accomplice.
As far as the “uncontradicted” testimony of Dr. Davis, which is very impressive, it is conceivable that the trial court accepted Dr. Davis’ testimony as true, but found the other circumstances surrounding the confession indicated that defendant knowingly and intelligently waived his Miranda rights. See Green, 655 So.2d at 284-285.
We recognize that a mentally retarded person, like Mr. Brown, may not fully comprehend his rights or posses's the intelligence to make a thoughtful choice to waive *264 his Miranda rights. Until the United States and the Louisiana Supreme Courts change the legal criteria in these types of cases, a mentally retarded defendant’s actual understanding of his Miranda rights and their implications will be lower or nonexistent compared to an average person. A special procedure to promote videotaping of Miranda warnings and subsequent interrogation should be [^implemented for this class of criminal defendants, or a legal representative or family member should be present to explain the rights.
Other evidence might be adduced at trial that more persuasively bears on the defendant’s competency to have knowingly and intelligently confessed. However, on the basis of the record before us, we deny defendant’s application for supervisory writs to overrule the trial court and suppress his confession.
Therefore, considering the totality of the circumstances before us, as well as the great deference accorded the trial court, we find no error in the denial of the defendant’s motion to suppress the confession.

WRIT GRANTED; RELIEF DENIED.

. The death of James Bryant forms the basis for the second degree murder charge against the defendant on the theory that he and James were engaged in an armed robbery or attempted armed robbery during which felony a person, James, died.

. A minute entry of December 17, 1997 has not been provided. Little's testimony starts on page 74; apparently a Detective Green testified immediately before Little. The record before this Court does not show who else testified at the motion hearing.