897 So.2d 821 (2005)
STATE of Louisiana
v.
Lance JAMES.
No. 2004-KA-0878.
Court of Appeal of Louisiana, Fourth Circuit.
February 23, 2005.
Eddie J. Jordan, Jr., District Attorney, Claire Adriana White, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge DENNIS R. BAGNERIS SR. and Judge DAVID S. GORBATY).
JOAN BERNARD ARMSTRONG, Chief Judge.

STATEMENT OF CASE
On November 11, 1999 the defendant, Lance James, was indicted for the first degree murder of Athumus Dunn. At his arraignment on November 15, 1999, he pled not guilty. In December, 1999, the court ordered a sanity commission, and on February 22, 2000 the court found him incompetent to proceed. However, the defendant was subsequently reevaluated, and on May 31, 2002 the court found him competent to proceed. On August 2, 2002, the court heard his motions to suppress the confession and identification. On August 14, 2002, the State amended the indictment to charge the defendant with second degree murder. The court denied his suppression *822 motions on August 22, 2002. On August 27, 2002, the defendant withdrew his plea of not guilty and entered a dual plea of not guilty/not guilty by reason of insanity. On October 10, 2002, at the conclusion of a three-day trial, a twelve-person jury found him guilty as charged. The court sentenced the defendant on November 18, 2002 to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On February 3, 2004, the court granted his motion for out-of-time appeal. The appeal record was lodged in this court on May 26, 2004. The defendant's brief was filed on June 23, 2004, and the State responded on July 30, 2004.

FACTS
On the evening of August 7, 1999, Arthumus Dunn was shot to death on the sidewalk in front of 2622 S. Galvez Street. Police officers responding to the scene found Dunn's body lying on the sidewalk next to a chair. They also found a 9 mm shell lying next to his body. They found no guns near Dunn's body, and his wallet was empty. However, there was jewelry on his body. An autopsy performed the next day showed Dunn died of a gunshot wound to his left temple, with the bullet exiting the other side of his head. There were powder marks around this wound, leading the forensic pathologist who performed the autopsy to conclude that Dunn was shot at close range. Dunn had a second, superficial gunshot wound behind his left ear, and the pathologist was able to retrieve a spent 9 mm bullet from this wound. Fluids taken from Dunn's body were negative for both alcohol and street drugs.
N.O.P.D. Homicide Det. Bernard Crowden testified that he responded to the call of the murder. He testified that no witnesses came forward on the night of the shooting, but that sometime afterward he received a tip that a young man named Lance, who possibly lived in the next block, was the perpetrator. Det. Crowden testified that he discovered the defendant, Lance James, lived in that block. Det. Crowden stated that on September 14, 1999, he went to the defendant's house, spoke with the defendant's grandmother, and left his number for the defendant to call him. Later that day, the defendant called Det. Crowden and agreed to meet with him, and officers escorted James to the Sixth District police station. Det. Crowden testified that George Haynes, the defendant's cousin, also accompanied the defendant to the police station, but Haynes remained in the hallway while the officers questioned James.
Det. Crowden testified that after he advised the defendant of his rights, the defendant signed a waiver form and gave a taped statement wherein he denied any knowledge of the murder. According to the defendant, he was with his cousin George Haynes at the time of the shooting. Det. Crowden testified that he then spoke with Haynes. After speaking with Haynes, Det. Crowden returned to the defendant and questioned him again. As a result of this brief questioning, the defendant agreed to give a second taped statement. Det. Crowden testified he advised the defendant again of his rights, and the defendant gave a second statement wherein he admitted shooting Dunn. Det. Crowden testified he arrested the defendant for Dunn's murder, and he subsequently obtained a warrant to search the defendant's house. However, no evidence was seized from the residence.
Det. Crowden testified that during the second statement, the defendant stated that a man named Dwight, who lived across the street from the scene of the shooting, was present when he shot Dunn. Det. Crowden testified he contacted *823 Dwight Nelson on November 10, 1999, and he agreed to give a statement at the Sixth District police station. In conjunction with this statement, Nelson viewed a photographic lineup from which he chose the defendant's picture as that of the shooter.
Dwight Nelson testified that he lived across the street from the scene of the shooting. He stated he knew both Dunn and the defendant. Nelson testified that on the evening of August 7, 1999, he was sitting in a chair on the other side of the street from his residence. He testified that he could see Dunn and others, including the defendant, gambling down the street. Nelson testified that at some point Dunn walked up to him, and they conversed. He stated that Dunn was counting his money when the defendant walked up to Dunn and told Dunn to "give it up." Dunn refused, and the defendant shot him. Nelson testified that he scrambled to get away, and as he was running away he turned and saw Dunn fall over the chair in which Nelson had been sitting. Nelson testified he saw the defendant stand over Dunn and shoot him a second time. The defendant stooped down next to Dunn's body, and then the defendant ran from the scene. Nelson testified that he ran to his sister's house and told her to call the police. Nelson testified that Dunn was not armed when the defendant shot him.
Nelson testified that he did not speak with the police on the night of the shooting out of fear of the defendant, who was among the crowd of people standing in front of his house while the police investigated the shooting. He indicated that the defendant had changed his clothes by that time. Nelson admitted that the defendant did not threaten him, point the gun at him, or ask him for any money just prior to the shooting. Nelson testified that he later gave a statement to the police and chose the defendant's photograph from a lineup. Nelson positively identified the defendant both at the lineup and in court as the person who shot Dunn.
The State played the tape of the defendant's second statement wherein he confessed to the murder. In the confession, the defendant admitted he lied in his first statement when he denied any involvement in the murder. He stated that a few days prior to the shooting he and Dunn were shooting dice. The defendant stated he won a few turns, and as he was reaching for the money, Dunn insisted that the defendant had not won the round because he "fell off the point." The defendant stated that he had won, and Dunn then drew a gun and told him he had lost. The defendant then backed away, and Dunn took his money and left. The defendant stated he subsequently bought a gun from a "crackhead" and hid the gun in his grandmother's back yard. The defendant stated that on the day of the shooting he saw Dunn shooting dice with others on Galvez Street. He stated he waited until the game was over and it got darker, and then he approached Dunn, who was counting money and talking with a man named Dwight who lived in the block. The defendant stated that he walked up to Dunn and told him to "give it up." The defendant stated he turned his head and shot twice at Dunn. When Dunn fell to the ground, the defendant picked up the money Dunn had dropped from his hands and then fled. The defendant stated that after the shooting, he went home, cleaned himself, and changed clothes. He sat on his porch, which was in the next block from the shootings, and at some point he went to see a D.J. on S. Broad Street, but he soon returned home.
Dr. Raphael Salcedo testified for the defense as an expert in forensic psychology. Dr. Salcedo testified that he examined the defendant on five occasions. He described *824 the defendant's intelligence as borderline to mildly mentally retarded. He testified that the defendant's overall IQ was 65, but that his verbal score was in the low 70's. He testified that retardation is considered a mental defect. He stated that the defendant had primitive responses under stress and lacked some cognitive reasoning, but he maintained that these problems did not render the defendant incapable of determining right from wrong. In reaching this conclusion, Dr. Salcedo pointed to the defendant's denial of any involvement in the murder and his attempts to establish an alibi. Dr. Salcedo testified that while the defendant was hospitalized, he functioned at a low average in adaptive (day-to-day) functioning. He also scored high in his ability to cope with his environment while in the hospital, but that score was in comparison to others with developmental disabilities. Dr. Salcedo stated that the defendant was able to understand the proceedings against him as long as some extra care was taken.

A. Errors Patent

A review of the record reveals no patent errors.

B. Assignment of Error
By his sole assignment of error, the defendant contends the trial court erred by denying his motion to suppress the confession. Specifically, he argues the State failed to prove that he knowingly and voluntarily waived his rights prior to giving his second statement wherein he confessed to shooting the victim.
In State v. Vigne, 2001-2940, p. 6 (La.6/21/02), 820 So.2d 533, 537, the Court set forth the standard for determining whether a confession was voluntarily made:
A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Thornton, 351 So.2d 480, 484 (La.1977). Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
Even when a defendant has not expressly invoked his rights under Miranda,"[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A waiver is not established by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating statement. 2 Wayne R. LaFave, Jerold Israel, Nancy King, Criminal Procedure, § 6.9(d). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980).
*825 See also State v. Genter, XXXX-XXXX (La.App. 4 Cir. 4/7/04), 872 So.2d 552. In addition, when a defendant raises the voluntariness of his confession due to alleged mental deficiencies which would vitiate his knowing waiver of his rights, the State's burden increases. In State v. Brooks, 92-3331, pp. 11-12 (La.1/17/95), 648 So.2d 366, 373 the Court stated:
When the added factor of Brooks' acknowledged mental retardation is included in the calculus, the issue of the voluntary nature of Brooks' confession becomes enmeshed in the related, but distinct, question of the knowing and intelligent nature of Brooks' waiver. State v. Lindsey, 404 So.2d 466, 472 (La.1981) (citations omitted). Although our jurisprudence has consistently noted that diminished capacity may render a confession involuntary due to the confessor's inability to comprehend the ramifications of his actions, nonetheless we have also noted that the existence of a discernible mental defect does not invariably vitiate the ability to make a knowing, intelligent, and voluntary waiver of constitutional rights. [State v.] Benoit, [440 So.2d 129 (1983)]supra, at 131; Lindsey, supra, at 472. However, as the State concedes in its brief to this Court, although the defendant bears the burden of proving the existence of any mental abnormality which might render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary and obtained pursuant to a knowing and intelligent waiver of the defendant's constitutional rights. State v. Glover, 343 So.2d 118 (La.1977) (on rehearing).
See also State v. Raiford, XXXX-XXXX (La.App. 4 Cir. 4/23/03), 846 So.2d 913[1]. The reviewing court must look to the "totality of the circumstances" to determine whether the waiver was knowing, which include the defendant's conduct, experience and background, as well as the facts and circumstances of the case. See State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272; State v. Brown, 98-2214 (La.App. 4 Cir. 12/16/98), 753 So.2d 259.
In Brooks, the defendant argued his waiver of his rights was not knowing partially because he was mentally deficient. Testimony established his IQ scores varied from 67 to 44 to 61 during his pretrial incarceration, and while the doctors presented by the State stated he was mildly mentally retarded, the defense doctors testified he was mildly to moderately to severely retarded. Nevertheless, he had learned to drive and was employed at the time of the crimes and his arrest. In addition, although he did poorly when his writing skills were tested, he did quite well on verbal testing. There was evidence he repeatedly faked emotional disturbances in order to get drugs and that he was malingering. One physician described him as uneducated, not retarded. On review, the Court found the trial court did not abuse its discretion by crediting the opinion of the State's experts and denying the motion to suppress his confession.
Likewise, in Green the Court found the defendant knowingly waived his rights even though he was mildly mentally retarded. As in the present case, the defendant waived his rights both verbally and by signing a waiver form. In giving his first statement after signing the waiver form, he admitted he was at the scene of the crime but was not involved. He was questioned a second time, and he admitted owning the gun used in the crime, which he threw away after the crime. He voluntarily *826 led the police to the place where he disposed of the gun, and the officers found it and seized it. On the way back to the police station, the officers continued questioning him, and he admitted he was the gunman. When they returned to the police station, the officers again advised him of his rights, after which he gave a second statement confessing to the shooting. At the suppression hearing the officers testified that the defendant appeared to understand his rights and knowingly waived them. The statement itself showed the officers advised the defendant of his rights and asked him if he understood. The defendant presented a doctor who testified that the defendant's IQ was 65, making him mildly mentally retarded, and the doctor insisted the defendant would only have been able to understand his rights if they had been explained to him in simpler terms. The Court upheld the trial court's denial of his motion to suppress his confession, noting that the defendant accurately recalled the details of the crime and tried to minimize his participation in the crime. In addition, the Court noted the defendant had been arrested in the past and was no stranger to the criminal justice system.
In Brown, the officers advised the defendant of his rights when he was arrested, advised him again when he arrived at the police station, and advised him yet again before the officers took his taped statement. Although the defendant never told the officers his education level, he told them he could not read. In response, the officers advised him of each of his rights slowly, and after each right was read to him the defendant indicated he understood that right. He presented evidence that his verbal IQ was 69, his performance IQ was 71, and his full scale IQ was 69, placing him in the top of the mildly mentally retarded range. His expert testified the defendant was capable of understanding his rights if they were fully explained very simply, but his understanding would be poor if his rights were just read to him from a form. The defendant had been arrested before this crime. On appeal, this court found the trial court properly denied his motion to suppress his confession. This court noted the defendant told the officers three separate times that he understood his rights, and there was nothing to cause the officers to believe he did not understand. This court further noted that the inability to read did not automatically mean the defendant could not understand rights read to him. In addition, this court cited the defendant's familiarity with the criminal justice system through his prior arrests, as well as his attempts in his statements to minimize the extent of his guilt.
In State v. Hall, 98-0667 (La.App. 4 Cir. 12/22/99), 750 So.2d 1105, the defendant was found incompetent to proceed based upon initial testing which showed he was substantially retarded. However, after being institutionalized at a State facility, it was discovered that he had exaggerated his symptoms; he even admitted to personnel that he did so to keep from being prosecuted. In addition, he was observed interacting normally with his peers when he believed he was not being watched. Experts testified that even with the defendant not putting forward a full effort when tested, his scores showed him being mildly mentally retarded at worst. This court upheld the trial court's finding that the State proved he was able to knowingly and intelligently waive his constitutional rights.[2]
*827 By contrast, in Raiford, this court upheld the trial court's suppression of the defendant's confession. The defendant was arrested on an unrelated charge; at the time, the officers were unaware of the shooting which formed the basis of the case. After signing a waiver form, he made a statement wherein he inculpated himself in the shooting. He was allowed to speak with his aunt prior to making the statement, but the aunt testified she was upset when she spoke with him, and they really did not discuss the matter. She testified she was only told that the police suspected the defendant was with other people involved in a shooting. She also testified that when she met with the defendant at the police station she was under the impression that he had already given a statement admitting guilt. A psychologist who examined the defendant and his school records testified the defendant had attended special education classes and had achieved only a second-grade level of learning. The psychologist testified he tested the defendant, who had a verbal IQ score of 59 and a performance score of 51. The psychologist described the defendant as "trainable mentally retarded" but not "educable." He testified the defendant's answers to the officers' questions showed confusion, and he stated the defendant could not make an intelligent decision on his own to waive his rights. Other doctors who examined the defendant testified the defendant was mildly to borderline retarded due to his IQ score of 68-72. They agreed that the defendant probably would understand his rights if they were explained to him in simple terms. However, one doctor who interviewed the defendant and reviewed his statement testified the defendant could understand his rights. The trial court suppressed the statement, and on review this court affirmed the trial court's ruling. In reaching this decision, this court looked to several of the cases cited above as well as the circumstances of the defendant's case and his statement itself. This court also noted that the officers did not testify that they tried to ascertain if the defendant understood his rights.
Likewise, in State v. Anderson, 379 So.2d 735 (La.1980), the Court ruled the State failed to prove the defendant knowingly waived his rights. The officers had to re-read the seventeen-year-old defendant his rights and tried to explain his rights to him, but he insisted he did not understand his rights. The officers took his statement nonetheless. One of his former teachers testified at the suppression hearing that four years earlier the defendant had the comprehension level of an eight-year-old child, but the teacher surmised his level had probably regressed after he dropped out of school. She also testified that children are often taught in special education classes to be cooperative and to agree readily to suggestion. The trial court noted that the defendant's IQ was 50-69, and there was no evidence he was self-sufficient. The court further noted the defendant could not read, and although the officers were not sure he understood his rights, they still chose to take his statement.
In two other cases cited by the defendant, U.S. v. Garibay, 143 F.3d 534 (9th Cir.1998), and Cooper v. Griffin, 455 F.2d 1142 (5th Cir.1972), the courts found the State did not meet its burden of proving the defendants knowingly waived their rights. In Garibay, the evidence showed the mentally-deficient defendant did not *828 understand English well, and the officers advised him of his rights only in English. In Cooper, the defendants, who were fifteen and sixteen years old at the time they gave their statements, were both mildly to borderline mentally retarded. In addition, one boy was suffering from a gunshot wound when he gave his statement, while the other was questioned for twelve hours before giving his statement.
Here, at the suppression hearing Det. Crowden testified that he contacted the defendant's family on September 14, 1999, and when he learned the defendant was not at home, he left his card with a message for the defendant to call him. Later that night the defendant called him and indicated his willingness to speak with the officers, but he needed a ride to the police station. Det. Crowden testified the defendant arrived at the police station at approximately 9:45 p.m., and the officers advised him of his rights and the fact that he was under investigation for the murder. Det. Crowden testified the defendant appeared to understand his rights. He identified the waiver of rights form that the defendant signed, and the detective insisted the defendant checked the box on the form indicating he understood his rights. Det. Crowden testified the defendant then gave his first taped statement to him and Det. Runmore.
In the first taped statement, the defendant indicated he had completed the tenth grade. He indicated he could read a little and could write. He denied any participation in the murder, placing himself at two different locations successively on the night of the shooting. He admitted seeing the victim lying on the ground after the police arrived on the scene. He also admitted having previously seen the victim in the area of the shooting, which was in the next block from the defendant's house, but he denied seeing him there on the day of the murder.
Det. Crowden testified that this first statement matched the brief verbal statement the defendant gave prior to the taped statement. Because the defendant indicated he was with his cousin George Haynes all day on the date of the murder, Det. Crowden left the room to speak with Haynes, who had accompanied the defendant to the police station. Det. Crowden stated that there were many inconsistencies in the defendant's first statement, and when he spoke with George Haynes he became even more suspicious because Haynes used exactly the same words to describe his and the defendant's movements on the day of the crime. Det. Crowden testified that there was a gap of forty to fifty minutes between the time the first taped statement ended and the second one began, and during that time he spoke with Haynes and the defendant was allowed to take a break.
Det. Crowden testified that he went back to the defendant and spoke with him, indicating his suspicions. The defendant then admitted he shot the victim. Det. Crowden arrested him for murder and re-advised him of his rights. The defendant then gave his second taped statement wherein he confessed to killing the victim. Det. Crowden testified the defendant indicated he understood his rights, and the detective denied forcing or coercing the confession or promising the defendant anything in return for the confession.
The second taped statement itself shows the officers advised the defendant of his rights at the beginning of the statement. In addition, Det. Runmore stated: "Now, Lance this means that you don't have to tell us anything. That you could have a lawyer sitting right here while you give us this statement. If you can't afford an attorney, an attorney will be given to you *829 and anything you tell us will be used against you in court. Do you understand that?" The defendant replied that he did. Det. Runmore then asked the defendant to tell them in his own words what happened on the night of the murder, and the defendant gave his statement.
The trial court denied the motion to suppress the confession based only upon what was presented at the suppression hearing. The court noted that considering the totality of the circumstances of the case as presented at the hearing, the defendant admitted having a tenth-grade education and that he could read and write. The court found that based on the evidence presented at the hearing, the State showed the defendant was "sufficiently aware of the import of his statements to fabricate a story and solicit help from his cousin as a backup." The court noted the fact that the defendant had the intellectual capacity to play dice, and it stated that the defendant's responses on the tape led the court to find the defendant understood his rights. The court specifically stated: "The defense has introduced no evidence that would refute the conclusion that the statements were voluntary and made with a knowing and intelligent waiver of rights."
The defendant now argues that the trial court erred by finding that he knowingly waived his rights because his mental retardation rendered him incapable of understanding his rights. As noted by the trial court, however, the defense presented no evidence at the suppression hearing of his mental state at the time he made his statement. Indeed, defense counsel's cross-examination of Det. Crowden, the only witness at the hearing, did not dwell on whether the appellant was able to understand his rights. Thus, based on the evidence presented at the suppression hearing, it is clear that the issue of the defendant's mental condition was not raised, and the State met its burden of showing a knowing waiver of the appellant's rights. Therefore, based upon what was presented at the suppression hearing, the trial court correctly denied the motion to suppress the evidence.
The foregoing analysis supplies sufficient reason by itself to justify the affirmation of the defendant's conviction and sentence. Moreover, even if this Court were to assume for the purposes of argument that the trial court should have weighed the defendant's mental condition in view of the fact that, although evidence of the appellant's mental condition was not introduced at the suppression hearing, the trial court was aware of his mental state because the court had previously declared him incompetent to proceed, we would still be compelled to conclude that the defendant's conviction and sentence should be affirmed. Pursuant to this argument we shall now conduct an analysis of the record considering the evidence adduced at the competency hearings as well as that adduced at the suppression hearing in order to determine the defendant's ability to make a knowing and intelligent waiver of his rights.
The defendant gave his statement on September 14, 1999. In December, 1999 the court ordered a sanity commission to examine the defendant, and the first competency hearing was held on January 25, 2000. At that hearing, Dr. Richard Richoux testified he and Dr. Salcedo examined the appellant on January 11 and found that he had very little comprehension of his legal rights, including his right to remain silent. Dr. Richoux testified there was a possibility the appellant was malingering, but it appeared he had a "significant intellectual deficit", the extent of which he could not determine because the doctors had not administered an intelligence test. Because the scope of the examination *830 was to determine if the defendant was competent to stand trial, the majority of Dr. Richoux's testimony concerned the defendant's ability to understand his legal rights with respect to his trial. However, Dr. Richoux stated: "I would say he did not understand most of what's included in his legal rights." He recommended that the defendant be transferred to the state forensic facility for further testing. The parties stipulated that Dr. Salcedo's testimony would be substantially the same as that of Dr. Richoux.
Although the court found the defendant incompetent to proceed and ordered him transferred to the East Louisiana Mental Health facility in February, 2000, the defendant was not physically sent there until July. He was tested there, and a psychological evaluation prepared at the facility on July 27, 2000 indicated his verbal IQ score was 72 and his performance score was 62, giving him a full scale score of 65. The evaluation stated in part: "The 10 point difference between his Verbal and Performance IQ score is significant, suggesting his verbal comprehension abilities are better developed than his visual/perceptual processing skills." The evaluation indicated the defendant's verbal skills were in the borderline range, while his perceptual organization skills and his working memory were in the mildly mentally retarded range.
The defendant was discharged from the facility in October, 2000. At the next lunacy hearing, held on June 4, 2001, Dr. Mark Wilson testified that he was a psychiatrist at the facility, and he met with the defendant weekly from August, 2000 until the appellant's discharge in October. He testified that he and Dr. David Hale, a psychologist and the director of pre-trial assessments at the facility, tested the defendant and conducted legal rights education sessions with him. Dr. Wilson testified that testing showed the defendant was mildly mentally retarded, and as of September, 2000 he met the competency requirements to stand trial. Dr. Wilson further testified that although the defendant was not competent when he was admitted to the facility in July, he was close to meeting these requirements when he was admitted.
Dr. David Hale testified that he assessed the defendant when the defendant arrived at the facility and again before he left. He testified that the defendant had borderline competency when he arrived. He described the defendant as mildly mentally retarded with somewhat better adaptive functioning than would be expected from someone who was mildly mentally retarded, and he functioned at the upper limits of retardation.
At the September 20, 2001 lunacy hearing, Dr. Salcedo testified that he evaluated the defendant five times, three of these times after he was transferred back from the facility. He testified that after the first examination he believed the defendant was incompetent to proceed, but he attributed this in part to nervousness and lack of cooperation on the appellant's part. He reiterated that the defendant's verbal IQ score was higher than that of his performance score, and he indicated that understanding legal rights is tied to a person's verbal intelligence, which he described as the ability to understand verbal information. He testified that one of the reasons he recommended that the defendant be sent to the forensic facility was to rule out any exaggeration or malingering on the defendant's part. In his opinion the defendant was competent to stand trial. Dr. Richoux testified that he conducted clinical evaluations on the defendant, and he concurred with Dr. Salcedo's opinion.[3]
*831 The defendant argues that the evidence adduced at the competency hearings showed he was unable to understand his rights, and thus his waiver of them was unknowing. He points to the fact that the first statement shows that he did not understand he was a suspect in the case, even though he was under arrest at the time of the statement. He cites to his reference in his first statement that the officers were questioning "everybody" on Fourth Street about the murder. He also points to the fact that the waiver of rights form, which Det. Crowden testified the defendant signed prior to giving his first statement, indicates that the defendant was under arrest, even though Det. Crowden testified that he did not arrest the defendant until after he had admitted shooting the victim. However, the form itself is no proof that the defendant was arrested at the time he gave his first statement because both the "I am investigating" and the "You are under arrest" boxes are checked on the form. Det. Crowden testified at the suppression hearing that he arrested the defendant only after he had admitted shooting the victim, and this admission occurred between the first and second taped statements. He also testified that he re-advised the defendant of his rights when the defendant admitted between the two taped statements that he shot the victim. At trial, Det. Crowden testified that when he re-advised the defendant of his rights prior to taking the second taped statement, he checked off the "under arrest" box on the form.
The defendant argues he did not check the box on the form indicating he understood his rights, and he had trouble signing his name. Yet, Det. Crowden testified that the defendant himself checked the box on the form. In addition, it appears the only problem with the defendant's signature is that he initially started printing his name and then signed it.
The defendant insists he could not read and was not given time to think about his rights before he gave his first statement. He admits he told the officers he could read and write and that he had completed the tenth grade, but he states he did not want to admit he could not read. However, there is no evidence in the record that he could not read. In addition, Det. Crowden testified that the defendant studied the waiver form for a few minutes before he checked the box and signed the form.
The defendant further argues that his response at the end of the first statement indicates he did not understand the seriousness of the situation or that he did not have to speak to the officers, and his question at the start of the second statement concerning whether his family would have to go to court indicates he was unaware of the consequences of his statement. At the end of the first statement, the officers asked the defendant if he was forced to go to the police station to give a statement, and in response the defendant repeated that they had first come to his house, and because he was not there, they had left a message with this grandmother to have him call them. He also indicated that he called them back because he thought something may have happened. Contrary to the defendant's statement that this response meant he did not understand the seriousness of the situation, this response can be read to support his initial assertion *832 that he had nothing to do with the murder and that he came in to the station of his own volition. As to the question in the second statement concerning whether his family would have to come to court, this question appears when the tape is first turned on, and it is unclear what preceded the question or under what context it was posed. This question does not show the defendant did not understand what was happening or the consequences of his statement.
The defendant contends that the content of his statements shows he did not have the intellect to understand his rights. He points out that he used only simple words in his statements, that he answered questions with questions, that he said "ha?" (meaning "huh?") many times, and that he repeated parts of the questions in many instances. He also points to the fact that in his second statement the officers asked him leading questions when trying to establish if he understood his rights. Indeed, the defendant notes, in middle of the first statement, one officer was moved to ask him if he knew where he was. In response, he answered he was at the police station, although he did not know the name of the district station where he was. However, after reading the two transcripts and listening to the tapes of these two statements, it is not apparent that the defendant's intelligence was so low that he could not understand his rights or the consequences of his waiving of them.
The defendant insists that he could not understand his rights because of his mental condition. He notes that all of the doctors who examined him testified that he was mildly mentally retarded. He particularly points to the testimony of Dr. Richoux from the first competency hearing held in January, 2000, wherein Dr. Richoux testified he found that the defendant had very little comprehension of his legal rights, including his right to remain silent. Dr. Richoux spoke of the appellant's "significant intellectual deficit," the extent of which he could not determine because the doctors had not administered an intelligence test. In addition, Dr. Richoux stated: "I would say he did not understand most of what's included in his legal rights."
The defendant fails to mention, however, Dr. Salcedo's testimony at the September, 2002 hearing after the defendant had returned from the forensic facility. Dr. Salcedo testified that he had believed the defendant was incompetent in January, 2000, but he attributed this finding in part of nervousness and lack of cooperation on the defendant's part. Dr. Salcedo testified that based upon the appellant's IQ test, his verbal understanding score in July, 2000 was 74, which he described as being borderline retarded. He further testified that understanding legal rights is tied to a person's verbal intelligence, which he described as the ability to understand verbal information. In addition, both Dr. Wilson and Dr. Hale testified that the defendant was borderline competent when he arrived at the forensic facility. Thus, at best the evidence adduced at the competency hearings showed the defendant was borderline mentally retarded with respect to verbal understanding.
The defendant maintains that he could not understand his rights because the officers merely read him the rights from the form. However, the transcript of the second statement wherein he confessed to shooting the victim shows the officers explained his right against self-incrimination, telling him that he did not need to make any statements. In addition, the officer recited each remaining right and asked after each right if the defendant understood that right, and the defendant indicated he understood.
*833 The defendant next points to other factors which lessened his ability to waive his rights knowingly. He was only seventeen when he was arrested, and he had no access to any relatives while being questioned. However, as per State v. Fernandez, 96-2719 (La.4/14/98), 712 So.2d 485, police officers are no longer required to have an interested adult present when questioning a juvenile, if indeed the defendant would have been considered to have been a juvenile when he was questioned. He also points out that at the time of the offense, he had not learned to drive, was not employed, and lived with his grandmother, all factors he insists show he was not independent and thus less competent. He also notes that his prior criminal history was "not relevant", being only arrests for theft and curfew violations. These arrests, however, would have exposed him to the criminal justice system and the advisement of his rights.
The defendant acknowledges that his first statement was an attempt to exculpate himself, but he maintains he was not aware he was a suspect when he gave this statement. Yet there appears to have been no reason to make up an alibi unless he feared he was a suspect in the murder. The defendant points to the forty to fifty minutes which elapsed between the end of the first statement and the start of the second one to show that it was likely that the officers schooled him on what to say in the second statement. However, Det. Crowden testified that during this time, he spoke with George Haynes, the defendant's cousin, and also during this time the defendant was allowed to take a break. Det. Crowden testified that after hearing George parrot back the same words used by the defendant concerning their activities on the day of the murder, he returned to the defendant and asked him why George told him exactly the same thing the defendant had told him. Det. Crowden testified that the defendant told him it was because the defendant had told George what to say before they had gotten to the police station. More importantly, it is difficult to see how the officers could have "schooled" the defendant in his confession because it was only in the second statement that the defendant mentioned that "Dwight" was an eyewitness to the shooting, having been seated right next to the victim when the defendant shot him. There is no indication the officers knew of Dwight's existence until the defendant placed him at the scene of the shooting. Indeed, the officers were not able to find Dwight until almost two months after the defendant confessed to shooting the victim.
Contrary to the defendant's argument, the State presented evidence which corroborated his confession. While there was no physical evidence to link the defendant to the murder, Dwight Nelson testified he was with the victim when the victim was shot, and he positively identified the defendant both via a photographic lineup and in court as the man who shot the victim. While Nelson might not have been a sterling witness, the jury was able to observe his demeanor and apparently believed his testimony, a credibility determination this court must not disturb unless it is strictly contrary to the evidence. See State v. Huckabay, XXXX-XXXX (La.App. 4 Cir 2/6/02), 809 So.2d 1093[4]; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. Such is not the case here.
It appears the defendant's case is most similar to that of Brown, supra. In both cases, the defendants appeared to understand their rights and repeatedly indicated that they did so. In both cases the defendants had some familiarity with the *834 criminal justice system, both having been arrested before, although the appellant's arrests were for lesser offenses and occurred while he was a juvenile. Both defendants were borderline to mildly mentally retarded, and both defendants had a higher verbal understanding score. Both defendants tried to exculpate themselves in initial statements. In addition, here all the doctors who examined the defendant testified that although he was found incompetent to proceed less than four months after confessing the crime, he was borderline competent by the time he arrived at the forensic facility for testing. In addition, one of the doctors who initially recommended he be found incompetent testified he attributed this finding at least in part to the defendant's nervousness and his unwillingness to cooperate fully in the evaluation. Based upon all these factors, taking into account not only the evidence adduced at the suppression hearing but also the evidence adduced in connection with the competency hearings, it appears the State still met its burden of showing the defendant understood and knowingly waived his rights prior to giving his second confession wherein he admitted shooting the victim. Indeed, the actual tapes of the statements, which the trial court heard prior to issuing its ruling, show that the defendant appeared somewhat confident while giving his first statement and do not show that the defendant was confused. While the defendant was much more subdued in the second statement, this change of temperament was consistent with someone who had just admitted he had shot someone who he believed had stolen his money, even though he insisted he had turned his head and shot, not meaning to kill the victim.
Thus, even considering the evidence presented in connection with the competency hearings in addition to that presented at the motion to suppress hearing, we find that the trial court correctly denied the motion to suppress the confession. In other words, as noted earlier in this opinion, regardless of whether we consider only the evidence submitted at the motion to suppress hearing, which is all we feel that the defendant is entitled to ask this court to do, or whether we also consider the evidence adduced at the lunacy hearings, we reach the same conclusion: there is no error in the trial court's denial of the motion to suppress.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Writ den. XXXX-XXXX (La.6/18/03), 847So.2d 1217
[2] See also State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, where the Court found the State sustained its burden of showing a knowing waiver. Although the officers knew the defendant had only eight years of schooling and was in special education, the officers testified he appeared to understand his rights. In addition, the Court pointed out that the defense merely alleged he was mentally deficient, presenting no evidence to support his claim.
[3] The trial court subsequently appointed two other doctors, Malik and Deland, to examine the defendant. They testified at a hearing on March 14, 2002, but that transcript is not included in the appeal record, nor is there any documentation of their findings. However, because they examined the defendant at least two years after he gave his confession, it is unlikely their testimony would have added much to the issue of whether he could understand his rights when he gave the statements. the defendant. They testified at a hearing on March 14, 2002, but that transcript is not included in the appeal record, nor is there any documentation of their findings. However, because they examined the defendant at least two years after he gave his confession, it is unlikely their testimony would have added much to the issue of whether he could understand his rights when he gave the statements.
[4] Writ den. XXXX-XXXX (La.11/1/02), 828 So.2d 564.